Filed 2/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| In re | F075897 |
| ARTHUR ESPINDOLA RAMIREZ, | (Madera Super. Ct. No. 13251) |
| On Habeas Corpus. | **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.

Kyle Gee, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Janet E. Neeley, Michael A. Cozoneri and Barton Bowers, Deputy Attorneys General, for Respondent.

-ooOoo-

Arthur Espindola Ramirez (petitioner) seeks to have his felony-murder special circumstance vacated based on California Supreme Court authorities decided after his convictions became final. We conclude he is entitled to that relief.

# FACTS AND PROCEDURAL HISTORY[1]

"**I. The Prosecution.**

"Eustacio [surname omitted] testified that he was 13 years old in January of 1996. He lived with his parents and [petitioner], who was then aged 19. Eustacio belonged to a 'Sureno' (southern California) street gang. His best friend was 16-year-old Josh [surname omitted]. On or about January 14, 1996, the [petitioner], Eustacio and Josh searched through an abandoned house and trailer. [Petitioner] found a sock in which a .25-caliber handgun (hereafter the .25) and a .32-caliber handgun (hereafter the .32) were secreted. The guns were given to a friend of Eustacio's father to be cleaned.

"The following day, the three went shopping with Eustacio's mother. At Eustacio's request, she purchased ammunition for the weapons. Eustacio took the ammunition from his mother and [petitioner] put it under one of the beds in the room Eustacio shared with [petitioner]. Later, [petitioner] retrieved the cleaned guns. While [petitioner] looked on, Eustacio loaded the .32 and Josh loaded the .25. Now armed, the three began walking around the neighborhood. They stopped at a couple of shacks where [petitioner] and Eustacio fired the .25. They went into a fig orchard and all three shot the .32 at the trees; Eustacio also shot the .25. They returned home and Eustacio hid the weapons under his bed.

"Early in the evening of January 17, 1996, the three companions decided to go to a grocery store to buy food for a barbecue. To protect themselves from members of rival 'Nortenos' (northern California) street gangs, Eustacio put the loaded .32 in his waistband; Josh carried the loaded .25. They told [petitioner] they were armed before they left the house. They rode their bicycles to a grocery store on Lake Street, but did not buy anything. They decided to go to Eustacio's sister's house. On the way they encountered two friends, Omar and Bart. With [petitioner] standing

---

[1]     The return includes respondent's request that we take judicial notice of our records in cases Nos. F029659 (*People v. Ramirez*), F060133 (*In re Ramirez*), and F073246 (*In re Ramirez*). Respondent has failed to file a separate motion and proposed order as required by California Rules of Court, rules 8.252(a) and 8.386(e). Because petitioner expressly states he has no objection, however, and because we cannot address the merits of the instant petition without reference to petitioner's prior appeal and petitions, respondent's request for judicial notice is granted.

We take our statement of facts from this court's nonpublished opinion in *People v. Ramirez* (June 18, 1999, F029659).

nearby, Eustacio and Josh showed them the handguns. Omar then displayed his own weapon. After Omar and Bart left, the three rode their bicycles onto Kennedy Street. A car pulled over and Candido [surname omitted], a friend of theirs 'from the juvenile hall board,' exited the vehicle. With [petitioner] standing next to them, Eustacio and Josh showed Candido their weapons. Candido said to them, ' "If you guys want, let's go jacking." ' [Petitioner] either replied, ' "Do whatever you guys want," ' or 'whatever we want to do.' Josh said ' "Let's go for it." ' Eustacio initially refused but eventually agreed to participate.

"The four went to Candido's house to get a shotgun. Candido went inside the house for five to ten minutes but, because his mother was home, came back outside without the weapon. They left Candido's house and rode down Lake Street, searching for a person to rob. Candido was riding Eustacio's bicycle; Eustacio was perched on the handlebars of [petitioner's] bicycle. Later, Eustacio traded places with Josh who then sat on the handlebars of [petitioner's] bicycle. They stopped at a gas station where Candido gave Eustacio a 'stun gun,' and took the .32 from him. [Petitioner] was standing beside Eustacio when he gave the handgun to Candido.

"Eventually, the four saw a sign for Skeeko's Bar. Candido said to the others, ' "That's it right there. That's the place." ' They rode across the street from the bar, stopped and waited. A short time later, a truck pulled into the lot. Candido said, ' "That's the car. That's it." ' He gave his bicycle to [petitioner] to hold and said to Eustacio, ' "Wait here." ' Candido and Josh jogged into the parking lot toward the truck. Eustacio heard keys locking a door and then heard either Candido or Josh say, ' "Give me your money." ' He then heard a 'thump, somebody hit something.' Immediately thereafter he heard four or five gunshots, followed by three or four more shots. Eustacio moved closer to the truck; [petitioner] was behind him holding Candido's bicycle. They were met by Candido and Josh. Eustacio asked Candido what had happened. Candido replied that they were to 'get out of here.' Josh climbed onto the handlebars of [petitioner's] bicycle and the four rode off. Candido looked back and saw someone lying on the ground. They were soon stopped by a police officer. It appeared to Eustacio that Josh had thrown something into a nearby field. [¶] … [¶]

"Madera City Police Officer Leon George testified that he was dispatched to Skeeko's Bar at 8:29 p.m. During a search of the outlying area, he stopped [petitioner] and his companions. Officer George recovered the .32 from Candido during a pat search. There were four spent shells and

3.

two live rounds in the weapon's chamber. He searched a nearby field and found the .25 lying on the ground. The weapon had one spent cartridge jammed in the chamber.

"[Patrick Shawn] Neal died in Skeeko's parking lot after having suffered six gunshot wounds to the head, chest, right hip, upper right arm and left finger. Four .32-caliber bullets and two .25-caliber bullets were removed from the victim's body. These bullets were fired from the seized .32 and .25.

"Madera City Police Detective Fabian Benabente testified that he interviewed all four suspects on the night of their arrest. The tape of his interview with [petitioner] was admitted as evidence and played for the jury. [Petitioner] told the officer that the four of them went to Skeeko's because 'we just wanted to jack somebody to get some money.' The decision to 'jack somebody' was made by '[e]verybody.' Josh rode on the handlebars of [petitioner's] bicycle. [Petitioner] knew that Josh was armed with the .25 and Candido had the .32. The guns had been found in an abandoned house and Eustacio's mother had purchased ammunition for the weapons. They waited for someone to approach. He and Eustacio waited on the street while Josh and Candido walked toward the truck. He heard Josh say, 'Give me your money,' and then the sound of approximately six gunshots. He did not see anything because 'I just didn't, didn't want to look. Cause' I knew they were just gonna' take his money and then just leave real fast. I didn't want him to see my face.' Josh and Candido ran back to them. Josh told them that the victim had punched him. He had shot his gun but did not know if he had hit the victim. They rode off. [Petitioner] saw Josh throw a gun onto the grass when they were stopped a short time later.

"**II.  The Defense.**  [¶] … [¶]

"In sum, [petitioner] testified that he did not know what happened to the guns found in the sock and he did not fire them, he was not involved in the purchase of ammunition, no one discussed or displayed any firearms on the evening of the murder, he was not asked to participate in a robbery, he did not know what Candido or Josh were going to do at Skeeko's Bar, and he did not go there with the intent to commit any crime." (*People v. Ramirez*, *supra*, F029659, fns. omitted.)

4.

Petitioner was charged with murder committed while he was an accomplice in the attempted commission of robbery (Pen. Code,[2] §§ 187, subd. (a), 190.2, subd. (a)(17) [count 1]), attempted robbery (§§ 211, 664 [count 2]), and conspiracy to commit robbery (§§ 182, subd. (a)(1), 211 [count 3]). The jury was instructed, concerning the robbery-murder special circumstance, that with respect to a nonkiller, the special circumstance could not be found true unless that person acted with the intent to kill, or with reckless indifference to human life and as a major participant.

On February 27, 1997, petitioner was convicted as charged and the special-circumstance allegation was found to be true. On November 7, 1997, he was sentenced to life in prison without the possibility of parole (LWOP) on count 1, plus five years on count 3. Sentence on count 2 was stayed pursuant to section 654. Petitioner appealed, claiming (insofar as is pertinent) that there was insufficient evidence to sustain the finding required for the special circumstance that petitioner acted with reckless indifference to human life and as a major participant. On June 18, 1999, we affirmed the judgment in its entirety and ordered amendment of the abstract of judgment. (*People v. Ramirez*, *supra*, F029659.) The California Supreme Court denied review on September 29, 1999, and remittitur issued on October 7, 1999.

On July 9, 2015, the California Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). The issue, as framed by the court, was "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.)

Petitioner subsequently filed a petition for writ of habeas corpus in Madera County Superior Court, in which (insofar as we are able to ascertain) he asserted *Banks* rendered him ineligible to receive an LWOP sentence. The petition was denied on December 14, 2015, with the trial court finding petitioner's conduct amounted to major participation

---

**2** All statutory references are to the Penal Code.

and reckless indifference to human life as required by *Banks*. On February 23, 2016, petitioner filed a petition for writ of habeas corpus in this court (case No. F073246), in which he raised the *Banks* issue. We solicited an informal response, then denied the petition on July 26, 2016.

On September 26, 2016, petitioner filed a petition for writ of habeas corpus in the California Supreme Court (case No. S237424), in which he again raised the *Banks* issue. On June 28, 2017, after soliciting and receiving an informal response, that court ordered the Secretary of the Department of Corrections and Rehabilitation to show cause before this court why petitioner is not entitled to the relief requested. We appointed counsel for petitioner, and also requested supplemental briefing regarding the effect, if any, of Senate Bill No. 1437, (Stats. 2018, ch. 1015, §§ 2, 3, 4, eff. Jan. 1, 2019, amending §§ 188, 189, & adding § 1170.95) on petitioner.[3]

## DISCUSSION

## I

### THE FELONY-MURDER SPECIAL CIRCUMSTANCE

Murder committed in the perpetration of, or attempt to perpetrate, robbery is deemed by statute to be first degree murder. (Former § 189, now § 189, subd. (a).)[4] Subdivision (a)(17) of section 190.2 provides for a penalty of death or LWOP for a defendant found guilty of first degree murder committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, … : [¶] (A) Robbery in violation of Section 211 …." (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A).)

---

[3] After receiving said briefing, we agree with the parties that we need not address this new law in the present proceeding.

[4] Unless otherwise specified, the pertinent statutes have remained unchanged since petitioner committed his offenses in 1996.

6.

The mere fact a felony enumerated in section 189, subdivision (a) was committed and death resulted is, however, insufficient of itself to establish a felony-murder special circumstance with respect to a person such as petitioner, who aided and abetted the underlying felony but was not the actual killer. Rather, the nonkiller must aid and abet the commission of murder in the first degree with the intent to kill (§ 190.2, subd. (c)), or, lacking intent to kill, must aid and abet the commission of the felony "with reckless indifference to human life and as a major participant … " (*id.*, subd. (d)).

Section 190.2, subdivision (d) was enacted in 1990 to bring state law into conformity with prevailing Eighth Amendment doctrine, as set out in the United States Supreme Court's decision *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298 & fn. 16.)

In *Tison*, two brothers aided an escape by bringing guns into a prison and arming two murderers, one of whom they knew had killed in the course of a previous escape attempt. After the breakout, one of the brothers flagged down a passing car, and both fully participated in kidnapping and robbing the vehicle's occupants. Both then stood by and watched as those people were killed. The brothers made no attempt to assist the victims before, during, or after the shooting, but instead chose to assist the killers in their continuing criminal endeavors. (*Tison*, *supra*, 481 U.S. at pp. 151–152.) The Supreme Court held the brothers could be sentenced to death despite the fact they had not actually committed the killings themselves or intended to kill, stating: "[R]eckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result. [¶] The [brothers'] own personal involvement in the crimes was not minor, but rather, … 'substantial.' Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to

7.

a robbery, each … was actively involved in every element of the kidnap[p]ing-robbery and was physically present during the entire sequence of criminal activity culminating in the murder[s] … and the subsequent flight.  The Tisons' high level of participation in these crimes … implicates them in the resulting deaths."  (*Id*. at pp. 157–158.)

The *Tison* court pointed to the defendant in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) as an example of a nonkiller convicted of murder under the felony-murder rule for whom the death penalty was unconstitutionally disproportionate.  Enmund was the driver of the getaway car in an armed robbery of a dwelling whose occupants were killed by Enmund's accomplices when they resisted.  (*Id*. at pp. 784–785; see *Tison*, *supra*, 481 U.S. at p. 146.)  In deciding the Eighth Amendment to the United States Constitution forbids imposition of the death penalty "on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" (*Enmund*, *supra*, at p. 797), the high court emphasized that the focus had to be on the culpability of Enmund himself, and not on those who committed the robbery and shot the victims (*id*. at p. 798).  "Enmund himself did not kill or attempt to kill; and, … the record … does not warrant a finding that Enmund had any intention of participating in or facilitating a murder.…  [T]hus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims].  This was impermissible under the Eighth Amendment."  (*Ibid*.)

In *Tison*, the United States Supreme Court acknowledged that the Tison brothers likewise did not intend to kill, and so they did not "fall within the 'intent to kill' category of felony murderers for which *Enmund*" found the death penalty permissible.  (*Tison*, *supra*, 481 U.S. at p. 151.)  The court found it "equally clear," however, that the pair also fell outside the category of felony murderers for whom *Enmund* found the death penalty disproportional (*Tison*, *supra*, at p. 151):  The facts shown by the record "not only

8.

indicate[d] that the Tison brothers' participation in the crime was anything but minor; they also … clearly support[ed] a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id*. at p. 152.)

The high court observed: "Although we state these two requirements [major participation in the felony committed and reckless indifference to human life] separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." (*Tison*, *supra*, 481 U.S. at p. 158, fn. 12.)

In *Estrada*, *supra*, 11 Cal.4th 568, the California Supreme Court read *Tison* to "instruct[] that the culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death' [citation]," and, so ascribed that meaning to the statutory phrase in subdivision (d) of section 190.2. (*Estrada*, *supra*, at p. 577.) The court concluded "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." (*Id*. at p. 578.)[5]

In *Banks*, *supra*, 61 Cal.4th 788, Matthews was convicted of first degree murder with a felony-murder special circumstance based on his having acted as the getaway

---

[5] Although the California Supreme Court determined in *Estrada* that trial courts have no sua sponte duty to explain the phrase "reckless indifference to human life" to the jury (*Estrada*, *supra*, 11 Cal.4th at p. 581), the written form of CALJIC No. 8.80.1 (1996 rev.) (5th ed. 1988) instructed petitioner's jury that "[a] defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being."

driver for an armed robbery in which Banks and others participated, and in which Banks shot and killed one of the robbery victims while escaping. (*Id*. at pp. 794, 797.) Matthews was sentenced to LWOP. (*Id*. at p. 797.) The Court of Appeal rejected his challenge to the sufficiency of the evidence supporting the special-circumstance finding and concluded his actions as a getaway driver for the underlying robbery, with knowledge death was always a possibility in an armed robbery, were legally sufficient under section 190.2, subdivision (d). The California Supreme Court granted review to address the "proper construction" of that statute (*Banks*, *supra*, at p. 797), and concluded the evidence was "insufficient as a matter of law to support the special circumstance," making Matthews "statutorily ineligible" for LWOP (*id*. at p. 794).

In reaching this conclusion, the state Supreme Court agreed with *People v. Proby* (1998) 60 Cal.App.4th 922, 923 (*Proby*), that the phrase "major participant" does not have a specialized or technical meaning. (*Banks*, *supra*, 61 Cal.4th at pp. 800–801.)[6] It observed, however, that "rephrasing *Tison*'s dictates in essentially synonymous words takes us only so far. To gain a deeper understanding of the governing test and offer further guidance," it turned to a close examination of *Enmund* and *Tison*. (*Banks*, *supra*, at p. 801.) It stated:

> "The two cases embrace the United States Supreme Court's long-standing recognition that, in capital cases above all, punishment must accord with individual culpability.… A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime. [Citations.]

> "With respect to the mental aspect of culpability, *Tison*, and in turn section 190.2[, subdivision ](d), look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citation.] The defendant must be aware of and willingly

---

**6**     *Proby* observed that "[t]he common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' " (*Proby*, *supra*, 60 Cal.App.4th at pp. 933–934.)

involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.…

"With respect to conduct, *Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in *Tison* [citation] and *Enmund* [citation] represent points on a continuum. [Citation.] Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility.… [¶] … [¶]

"Among those factors that distinguish the Tisons from Enmund, and thus may play a role in determining whether a defendant's culpability is sufficient to make his or her death eligible, are these: What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is anyone of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations].

"The People propose we treat as a major participant … anyone 'whose conduct involves the intentional assumption of some responsibility for the completion of the crime regardless of whether the crime is ultimately successful. As such, participation in planning with the intent of facilitating the commission of the crime, or participating in conduct integral to or for the purpose of facilitating the commission of the crime, constitutes major participation.' This test cannot be reconciled with the holdings of *Tison* and *Enmund*. Requiring only 'the intentional assumption of some responsibility for the completion of the crime' would sweep in essentially every felony murderer—indeed, even Earl Enmund himself—whether an actual killer or not. Doing so would violate the Supreme Court's requirement that each felony murderer's culpability be considered individually and disregard the court's corresponding recognition that, for

11.

many nonkillers, death is disproportionate to that individual's culpability and thus unconstitutional.

"Finally, we note the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2[, subdivision ](d) for life imprisonment without parole. As a purely constitutional matter, nothing would foreclose California from imposing life imprisonment without parole sentences on felony murderers with Matthews's degree of culpability. [Citations.] Section 190.2, [subdivision ](d) does not, however, extend eligibility for life imprisonment without parole to every defendant exhibiting the constitutionally minimum degree of culpability for that sentence. Instead, by importing the *Tison-Enmund* standard, it permits such a sentence only for those felons who constitutionally could also be subjected to the more severe punishment, death. As a matter of state statute, then, the *Tison-Enmund* standard is 'applicable to *all* allegations of a felony-murder special circumstance, regardless of whether the People seek and exact the death penalty or a sentence of life without parole.' [Citation.] Accordingly, the considerations that informed the Supreme Court's distinctions between differing levels of culpability in *Tison v. Arizona* [citation] should guide juries faced with making those same distinctions under section 190.2[, subdivision ](d)." (*Banks*, *supra*, 61 Cal.4th at pp. 801–804, fn. omitted.)

The state high court concluded the record evidence placed Matthews at the *Enmund* pole of the *Tison-Enmund* spectrum. (*Banks*, *supra*, 61 Cal.4th at p. 805.) Because he was "no more than a getaway driver, guilty like Earl Enmund of 'felony murder *simpliciter*' [citations] but nothing greater," he was ineligible for the death penalty under *Tison* and *Enmund*. (*Banks*, *supra*, at p. 805.) Since the evidence was insufficient to make him death eligible under those cases, it was also insufficient to sustain a true finding as to the special circumstance and make Matthews eligible for LWOP under state law. (*Ibid*.)

The court further found Matthews lacked the mens rea necessary to make him legally eligible for a sentence of LWOP. (*Banks*, *supra*, 61 Cal.4th at p. 807.) It explained:

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' [Citation.] There was evidence from which the jury

12.

could infer Matthews knew he was participating in an armed robbery. But nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death. There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, Banks's killing of [the victim] was apparently a spontaneous response to armed resistance from the victim.

"The Court of Appeal, in a line of reasoning endorsed by the People, concluded that '[w]ith advance knowledge of the planned robbery and burglary, Matthews had to be aware of the risk of resistance and the extreme likelihood that death could result.' According to the appellate court, Matthews's confederates surely 'anticipated as much because they were armed,' and although Matthews was not armed, the jury could readily infer Matthews knew his confederates were.

"The problem with the sufficiency of such evidence to prove reckless indifference to human life is that *Enmund* and *Tison* deem identical evidence inadequate.…

" … Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum. [Citation.]

" … The Supreme Court [in *Tison*] made clear felony murderers like Enmund, who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life. The Court of Appeal's equating Matthews's similar awareness with reckless indifference to human life cannot be squared with *Enmund* and *Tison*.[7]

"Alternatively, the People highlight the United States Supreme Court's recognition that 'there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life.' [Citation.] They argue each crime listed in [former] section 189 [(now § 189, subd. (a))] qualifies and thus

---

**7**    In a footnote at this point, the court disapproved *People v. Lopez* (2011) 198 Cal.App.4th 1106 to the extent it held knowledge an accomplice was armed can, by itself, establish reckless indifference to human life under section 190.2, subdivision (d). The court also disapproved *People v. Hodgson* (2003) 111 Cal.App.4th 566 to the extent it could be read to hold awareness a robbery accomplice was armed, without more, establishes the necessary subjective awareness of a grave risk of death. (*Banks*, *supra*, 61 Cal.4th at p. 809, fn. 8.)

13.

Matthews, because he participated in two such crimes, robbery and burglary, has automatically exhibited reckless indifference to human life.

"Section 189[, subdivision (a)] codifies the first degree felony-murder rule [citation]; participation in the crimes it lists subjects one to liability for first degree murder. To make participation in such crimes also sufficient, without more, to establish categorically reckless indifference to human life would collapse the *Tison* inquiry into the felony-murder inquiry and treat all felony murderers as equally culpable and eligible for death. But the central holding of *Enmund*, and *Tison* after it, was that for purposes of the death penalty, not all felony murderers are equally culpable and eligible for death. The People's position embraces the very punishment—death eligibility for participation in felony murder *simpliciter*—the Supreme Court has declared unconstitutional. [Citations.]

"That one may infer the felonies listed in section 189[, subdivision (a)] are those the Legislature views as 'inherently dangerous' [citation] does not change the analysis. Whether a category of crimes is sufficiently dangerous to warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquires. Section 189[, subdivision (a)] cannot be read as attempting to conflate them, and in any event under *Enmund* and *Tison* it would be impermissible for a state legislature to declare all participation in broad classes of felony murders, such as burglaries or robberies, punishable by death without further inquiry into each individual defendant's mental state. [Citations.][8]" (*Banks*, *supra*, 61 Cal.4th at pp. 807–810, fn. omitted.)

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), Clark was convicted, inter alia, of first degree murder, with robbery-murder and burglary-murder special circumstances found true, based on his liability as an aider and abettor to an accomplice's fatal shooting of a victim during an attempt to rob a CompUSA store. There was no evidence Clark himself intended to kill the victim. On appeal, Clark claimed the evidence was

---

**8** "*Tison* does not specify those few felonies for which any major participation would 'necessarily exhibit[] reckless indifference to the value of human life.' [Citation.] One could surmise a partial list of crimes the United States Supreme Court might agree on—say, the manufacture and planting of a live bomb. But we need not speculate. Even the Tisons' prison break of two convicted murderers was remanded, rather than treated as per se demonstrating the requisite reckless indifference. Plainly, armed robbery does not qualify." (*Banks*, *supra*, 61 Cal.4th at p. 810, fn. 9.)

insufficient to establish that he was a major participant in the CompUSA crimes and that he acted with reckless indifference to human life. (*Id.* at pp. 610–611.)

With respect to the major participant prong, the high court considered the relevant factors laid out in *Banks*, and concluded Clark had a prominent role in planning the criminal enterprise that led to the victim's death; however, there was no evidence about his role in supplying the weapon (although an inference could be drawn that use of a weapon was part of his plan for the robbery), his awareness of the particular dangers posed by the crime, or his awareness of the past experience or conduct of the shooter. The court noted that although Clark was in the area during the robbery, he was not in the immediate area of the shooting. (*Clark, supra,* 63 Cal.4th at pp. 613–614.) The court recognized there might be some question concerning the amount of culpability that should be assessed for a planner of a felony leading to a murder who was not present during the immediate circumstances leading to the murder, but concluded it did not need to decide whether Clark was a major participant under the circumstances of the case since the evidence was insufficient to show he exhibited reckless indifference to human life. (*Id.* at p. 614.)

As to that prong, the state high court examined *Tison* and *Banks*, and reiterated *Banks*'s rejection of the argument any defendant involved in a felony enumerated in former section 189 (now § 189, subd. (a)) automatically exhibited reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 616; see *Banks*, *supra*, 61 Cal.4th at pp. 809–810.) It further stated:

> "*Tison* held that the necessary mens rea for death eligibility may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.] As examples, the high court cited 'the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property,' and … 'the person who tortures another not caring whether the victim lives or dies' as two examples of such murderers. [Citation.] Notably, both examples

15.

involve a defendant who personally killed the victim—not, as in this case, *Enmund*, *Tison*, or *Banks*, a vicariously liable defendant who was not the actual killer. Nevertheless, these examples provide some indication of the high court's view of 'reckless indifference,' namely, that it encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.

"The Model Penal Code generally defines acting recklessly as follows: 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' [Citation.]

"This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her.… [R]ecklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' [Citation.] .…

"Finally, while the fact that a robbery involves a gun is a factor beyond the bare statutory requirements for first degree robbery felony murder, this mere fact, on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617, fns. omitted.)

To determine whether there was substantial evidence Clark exhibited reckless indifference to human life within the meaning of section 190.2, subdivision (d), the Supreme Court considered "the specific facts of Clark's case in light of some of the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Clark*, *supra*, 63 Cal.4th at p. 618.) As in *Banks*, the court found no one factor was necessary or necessarily sufficient. (*Clark*, *supra*, at p. 618; see *Banks*, *supra*, 61 Cal.4th at p. 803.)

16.

The first consideration was the defendant's knowledge of weapons and use and number of weapons. The court noted that the mere fact of a defendant's awareness that a gun would be used in the felony was insufficient to establish reckless indifference to human life, but on the other hand, it was significant in *Tison* that the brothers brought an arsenal of weapons into the prison and guarded the victims. The court also found that a defendant's use of a firearm, even if the defendant did not kill the victim, could be significant. (*Clark*, *supra*, 63 Cal.4th at p. 618.) In Clark's case, the evidence showed only that there was one gun at the scene of the killing, it was carried by someone other than Clark, and it had been loaded with only one bullet. (*Id.* at p. 619.)

The next factor was the defendant's physical presence at the scene and opportunities to restrain the crime and/or aid the victim. The court stated: "Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state.… [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th at p. 619.) The court cautioned, however, that physical presence was not invariably a prerequisite to a finding of reckless indifference. "Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims." (*Ibid.*) In Clark's case, Clark was waiting across the parking lot for a cohort to secure the store, when the cohort shot the victim. There was no evidence Clark instructed the shooter to use lethal force, had an opportunity to observe the

shooter's response to the victim's unanticipated appearance, or to intervene to prevent the killing. (*Ibid*.)

The court next examined the duration of the felony. The court explained: "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark*, *supra*, 63 Cal.4th at p. 620.) In Clark's case, the robbery was planned for after closing time, when most store employees would be gone. Although Clark anticipated some employees would be present, the plan was to handcuff them in a bathroom, while the robbery itself took place elsewhere in the store. Thus, the period of interaction between perpetrators and victims was designed to be limited, although, because the robbery was to occur in a public space over a substantial duration, it did involve the risk of interlopers, such as the victim, happening upon the scene. (*Id*. at pp. 620–621.)

Another factor was the defendant's knowledge of a cohort's likelihood of killing. The court stated: "A defendant's knowledge of factors bearing on a cohort's likelihood of killing are [*sic*] significant to the analysis of reckless indifference to human life. Defendant's knowledge of such factors may be evident before the felony or may occur during the felony…. [¶] … A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 621.) In Clark's case, no evidence was presented that the shooter was known to have a propensity for violence, let alone that Clark was aware of such a propensity. Nor was Clark in a position to observe anything in the shooter's actions just before the killing that would have indicated the shooter was likely to engage in lethal violence. (*Ibid*.)

18.

The final factor considered by the court was the defendant's efforts to minimize the risks of violence during the felony. Clark argued his efforts in this regard should be taken into account, as the robbery was undertaken after closing time when most of the employees were gone, there were not supposed to be any bullets in the gun, and the gun had only been loaded with one bullet. (*Clark*, *supra*, 63 Cal.4th at pp. 621–622.) The state Supreme Court found this factor relevant but not dispositive, due to "the two-part nature of the mens rea analysis for recklessness under *Tison* and section 190.2, subdivision (d)." (*Id*. at p. 622.) The court explained: "[R]ecklessness … implicates both subjective and objective elements for the offense.… [E]vidence of any effort by defendant to minimize the risks of violence could possibly be sufficient to rebut a conclusion of defendant's subjective awareness of engaging in activities risky to human life. But … , although the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness. Therefore, it would be possible for the defendant to have engaged in apparent efforts to minimize the risk of violence but still be determined by the jury to have been reckless, given all the circumstances known to defendant surrounding the crime." (*Ibid*.) Accordingly, the court concluded that a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life did not foreclose a determination of reckless indifference to human life. (*Ibid*.)

Although it ultimately upheld Clark's death sentence for reasons not pertinent here, the California Supreme Court vacated the robbery-murder and burglary-murder special-circumstance findings. The court found insufficient evidence to support the inference Clark was recklessly indifferent to human life. (*Clark*, *supra*, 63 Cal.4th at pp. 623–624.)

We turn now to petitioner's case. "To determine whether the evidence supports a special circumstance finding, we must review ' "the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable,

19.

credible, and of solid value such that a reasonable jury could find" ' the special circumstance allegation true ' "beyond a reasonable doubt." ' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.)

From the evidence presented at petitioner's trial, jurors reasonably could have inferred petitioner supplied the guns that ultimately were used in the attempted robbery and murder, although there was no evidence any criminal conduct was contemplated at that time. Jurors also reasonably could have inferred petitioner knew the guns were loaded and operable, and that Eustacio and Josh were carrying the guns, when petitioner, Eustacio, and Josh headed for the grocery store on the night the offenses were committed.[9] Jurors reasonably could have inferred petitioner agreed with the suggestion the group "jack" somebody; was aware an armed robbery was contemplated; and gave one of the actual killers a ride to Skeeko's Bar, waited for a likely victim to appear, and then acted as a getaway driver after the shooting. Jurors also reasonably could have inferred petitioner was close enough to hear and possibly see what was going on, although he was not at the immediate location of the killing.

On the other hand, there was no evidence the killing was planned or even contemplated. Rather, it appears the shooting occurred in response to the victim resisting and striking Josh. There was no evidence petitioner was involved in any planning beyond agreeing the group should "jack" someone, after which he simply acquiesced in whatever Candido said to do. The Attorney General posits that petitioner was older than his confederates, and this fact reasonably supports the inference his participation in

---

[9] Petitioner points out that although he was present when Eustacio and Josh loaded the guns on January 14, 1996, which was after the guns had been cleaned and prior to them being fired at the shack and in orchard, he was not present when they again loaded the firearms on January 17, 1996, the day of the robbery. Nevertheless, the evidence showed Eustacio's mother purchased the ammunition at a sporting goods store. This reasonably suggests she purchased more than a few loose bullets. Because Eustacio told petitioner that he (Eustacio) was carrying a gun when they left the house the day of the robbery, it is reasonable to infer petitioner surmised that gun, at least, was loaded or partially loaded.

planning the robbery was substantial. In our view, however, the conclusion drawn by the Attorney General is merely speculative when compared to the actual trial evidence. To be relied upon in a determination whether evidence is substantial, an inference "must be reasonable. An inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669.) Similarly, a reasonable inference may not be based on mere suspicion, imagination, supposition, surmise, conjecture, or guesswork. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) " '[S]peculation is not evidence, less still substantial evidence.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)

The Attorney General further asserts petitioner was, at most, only feet away from the deadly encounter. According to Eustacio's testimony at trial, however, he and petitioner were on the street, and there were cars parked in the parking lot between their location and where the shooting occurred. Thus, the evidence shows petitioner was in close proximity to the shooting, but it does not show he was close enough to exercise a restraining effect on the crime or his colleagues.[10]

The Attorney General says we may fairly infer petitioner knew Eustacio, with whom he lived, was a gang member. Even if we assume such an inference is reasonable, it says nothing about petitioner's knowledge of his cohorts' likelihood of killing. Indeed, the Attorney General concedes there is no evidence in the record to show petitioner's confederates had a prior history of violence or that petitioner was aware of any such history. That Eustacio was aware Candido was a gang member and knew him "from the juvenile hall board" does not mean petitioner possessed this knowledge. Moreover, that Eustacio and Candido had a history of delinquency—even if known to petitioner—does not, contrary to the Attorney General's claim, "fairly support an inference that petitioner

---

[10] The Attorney General's assertion petitioner "wanted a front-row seat" is so conjectural that it is not worthy of discussion.

21.

would have expected his armed confederates to use deadly force." (See *Banks*, *supra*, 61 Cal.4th at pp. 810–811.)

When the evidence and inferences that *reasonably* can be drawn therefrom are examined in accord with the applicable standard, it is readily apparent that, with regard to the major participant requirement, petitioner is much closer to the *Enmund* end of the continuum than he is to the *Tison* end. Taking into account the factors set out in *Banks* and *Clark*, the evidence does not support a finding his participation was any more substantial than that of Earl Enmund. To satisfy section 190.2, subdivision (d)'s requirement of major participation, a defendant's "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

Nor does petitioner's conduct demonstrate reckless indifference to human life. There is no evidence from which it reasonably can be inferred petitioner harbored a willingness to kill, or to assist his confederates in killing, to achieve the goal of robbing someone, or that he anticipated the potential for loss of human life beyond that usually accompanying an armed robbery. This is not reckless enough to support a special-circumstance finding. (See *Clark*, *supra*, 63 Cal.4th at pp. 617–618.) Considering all the evidence, "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623; see *In re Miller* (2017) 14 Cal.App.5th 960, 975–977 (*Miller*).)

Considering all the circumstances, we conclude no reasonable juror could have found defendant aided and abetted the attempted robbery "with reckless indifference to human life and as a major participant" (§ 190.2, subd. (d)), as those terms are set out in *Tison* and explicated by *Banks* and *Clark*. (Compare *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019–1021, 1023–1027 (*Bennett*) with *In re Loza* (2017) 10 Cal.App.5th 38, 49–54 (*Loza*) & *People v. Medina* (2016) 245 Cal.App.4th 778, 791–793.) Because the evidence is insufficient to sustain the jury's true finding on count 1's special

circumstance, that finding must be vacated. Retrial of the special-circumstance allegation is barred. (*People v. Lewis* (2008) 43 Cal.4th 415, 509, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918–920; *People v. Perez* (2016) 243 Cal.App.4th 863, 882.)

In reaching this conclusion, we necessarily reject the Attorney General's procedural arguments for barring relief.[11]

The Attorney General first claims *Banks* (and, by extension, *Clark*) is not retroactive to final judgments, because it neither created new law nor overruled existing California Supreme Court precedent. The nonretroactivity claim was considered and rejected in *Miller*, *supra*, 14 Cal.App.5th at pages 977 through 978. We agree with that court, which stated:

> "We begin with an overarching, dispositive point: Federal due process guarantees require reversal of the special circumstance finding in this case regardless of the Attorney General's California-law-based procedural arguments. That much is clear from the United States Supreme Court's decision in *Fiore v. White* (2001) 531 U.S. 225 (*Fiore*). There, the high court considered whether Fiore was entitled to habeas corpus relief when—after his conviction—the Pennsylvania Supreme Court interpreted the relevant penal statute in a manner that made clear Fiore's conduct was not within its scope. (*Id*. at p. 226.) In response to a certified question from the high court, the Pennsylvania Supreme Court stated its interpretation of the statute ' "did not announce a new rule of law" ' but rather ' "merely clarified the plain language of the statute." ' (*Id*. at p. 228.) With that answer in hand, the United States Supreme Court recognized Fiore's case 'present[ed] no issue of retroactivity' and instead raised only the question of 'whether Pennsylvania can, consistently with the Federal

---

[11] We address these claims out of an abundance of caution. Were there a valid procedural bar, we would have expected the California Supreme Court to deny the petition rather than issuing an order to show cause returnable before this court. (See *In re Robbins* (1998) 18 Cal.4th 770, 814, fn. 34.)

We recognize that procedural bars assist in protecting society's legitimate and significant interest in the finality of its criminal judgments. (*In re Reno* (2012) 55 Cal.4th 428, 451 (*Reno*).) This purpose loses some of its force in cases, such as petitioner's, that may be affected by the Legislature's enactment, effective January 1, 2019, of section 1170.95.

23.

Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit.' (*Ibid*.)

"The high court's answer, unanimously, was 'no.' The court held 'the Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt.' (*Fiore*, *supra*, 531 U.S. at pp. 228–229, citing *Jackson v. Virginia* (1979) 443 U.S. 307 and *In re Winship* (1970) 397 U.S. 358.) Thus, in *Fiore*'s words, '[t]he simple, inevitable conclusion is that Fiore's conviction fails to satisfy the Federal Constitution's demands.' (*Fiore*, *supra*, at p. 229.)

"The parallels to our case are exact, and the result must be identical. Like the Pennsylvania Supreme Court's opinion at issue in *Fiore*, our Supreme Court's opinions in *Banks* and *Clark* merely clarified the meaning of section 190.2—*Banks* and *Clark* merely clarified the 'major participant' and 'reckless indifference to human life' principles that existed when defendant's conviction became final. The federal Constitution therefore requires reversal of the special circumstance finding against defendant, and the Attorney General's procedural arguments can be no match for the United States Constitution's demands." (*Miller*, *supra*, 14 Cal.App.5th at pp. 977–978; see *Bennett*, *supra*, 26 Cal.App.5th at pp. 1006–1007, 1026–1027 [granting habeas petition based on insufficient evidence of special circumstance, under *Banks* and *Clark*, without discussion of retroactivity]; *Loza*, *supra*, 10 Cal.App.5th at pp. 41, 42, 55 [finding no need to discuss asserted procedural bars where sufficient evidence of special circumstance found under *Banks* and *Clark*].)

Next, the Attorney General invokes the rule of *In re Lindley* (1947) 29 Cal.2d 709, 723, which generally precludes using habeas corpus as a means of retrying issues of fact or reviewing routine claims the evidence presented at trial was insufficient. (*Reno*, *supra*, 55 Cal.4th at p. 505.) Petitioner's claim is not, however, a "routine" claim of insufficient evidence as described in *Lindley*. It does not involve retrying issues of fact, but rather the application of law to established facts. (See *Miller*, *supra*, 14 Cal.App.5th at pp. 979–980.) Accordingly, it falls outside *Lindley*'s limitation. (See *In re Harris* (1993) 5 Cal.4th 813, 840–841; *In re Zerbe* (1964) 60 Cal.2d 666, 667–668.)

Last, the Attorney General contends petitioner's claim is barred by the rule of *In re Waltreus* (1965) 62 Cal.2d 218, 225, which holds that "habeas corpus ordinarily

24.

cannot serve as a second appeal." This is not, however, an "ordinary" situation. Our analysis of petitioner's claim on direct appeal did not comport with the California Supreme Court's subsequent analyses of the issue in *Banks* and *Clark*.[12] Relief is appropriate. (See *In re Jackson* (1964) 61 Cal.2d 500, 505–506.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The special circumstance found true under Penal Code section 190.2, subdivision (a)(17) with respect to count 1 is vacated. The matter is remanded to the trial court with directions to resentence petitioner on that count, consistent with the views expressed in this opinion.

_____
HILL, P.J.

WE CONCUR:

_____
SNAUFFER, J.

_____
DESANTOS, J.

---

[12] We stated: "We reject defendant's argument that he was not a major participant in the attempted robbery. Defendant is analogous to the driver of the getaway car, only in this case it was the getaway bicycle. He transported Josh, one of the actual killers, to the robbery site. He then held Candido's bicycle while Candido and Josh approached the truck. After hearing the shots, defendant did not stop to assist the victim, or even flee in panic. Rather, he returned Candido's bicycle to him and transported Josh on the handlebars of his own bicycle away from the scene of the crime. The evidence also shows that defendant retrieved the cleaned guns which were used in the robbery and he knew that Josh and Eustacio and later Candido were armed at the time the robbery was planned. Finally, during his pretrial interview defendant testified that he deliberately averted his gaze from the victim. We therefore conclude that the evidence was sufficient to support the finding that defendant was a major participant in the attempted robbery and that he acted with reckless disregard for the victim's life." (*People v. Ramirez*, *supra*, F029659, fn. omitted.)

25.