Filed 7/15/21  P. v. Murphy CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B297552 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA011616) |
| v. | |
| WILLIAM CECIL MURPHY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge.  Reversed and remanded with directions.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1993, William Cecil Murphy was convicted of first degree murder based on his codefendant's fatal stabbing of the victim during the commission of a robbery. In 2019, Murphy filed a petition for resentencing pursuant to newly-enacted Penal Code section 1170.95.[1] Following an evidentiary hearing, the trial court denied the petition based on a finding that Murphy was a major participant in the robbery; however, the court never stated whether it also found that Murphy acted with reckless indifference to human life. We conclude the trial court erred in denying the petition because, even assuming the requisite findings were made, the evidence was insufficient to support a finding that Murphy acted with reckless indifference to human life. We accordingly reverse and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The 1992 Robbery and Murder[2]

On February 28, 1992, Carlos Bacab left his apartment on Buford Street at 5:15 a.m., to check his work schedule. He always carried his wallet in his pants and a box cutter he used at work.

_____

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

[2] The description of the 1992 robbery and murder set forth in this opinion is taken verbatim from the factual and procedural background in this court's 1995 opinion in the respective appeals filed by Murphy and his codefendant, Howard Anthony Terry. (*People v. Terry* (Mar. 27, 1995, B076823) [nonpub. opn.].) As will be discussed, this court's prior opinion was the only record on which the trial court relied in ruling on Murphy's section 1170.95 petition.

Bacab's body was found by Sheriff Deputy Diaz at 104th and Buford at 5:55 a.m. Bacab was lying in the street in his boxer shorts and a shirt. He had two stab wounds in the back. There were two puddles of blood. His closed box cutter lay in one of the puddles. Bacab's pants had been torn in two. A piece of the pants and his black jacket were on a driveway across the street.

Bacab died from two fatal stab wounds to his back which ruptured his aorta. He had abrasions on his jaw, forehead, elbow, arms and legs.

A trail of blood led across the street and to a pick-up truck parked in a carport. Bacab's wallet and papers lay behind the truck.

Howard Anthony Terry and Murphy were charged with murder during the commission of a robbery. They were tried together before separate juries. Terry has a rare blood type found in one person in four and a half million persons. Blood of the same type was found on the sidewalk at the crime scene, on the leg of Bacab's pants and on the lining of the right rear pocket. Terry's palm print and blood of Terry's type were found on the pickup truck in the carport.

A six or eight inch knife covered with blood was found in a yard, known in the neighborhood as "the jungle." Blood on the blade was consistent with Bacab's blood type and blood on the handle was consistent with Terry's blood type. Of the 19 bloodstains the police collected, none were of Murphy's blood type.

Between 5 and 5:10 a.m. on February 28, 1992, Murphy's sister, Cathy, let her brother Murphy into their grandmother's home near Buford and 104th Street. He went to bed. Between

6 and 6:15 a.m. Terry came into the house. Terry and Murphy are cousins. His finger was bleeding. Terry told Cathy that he had stabbed someone. "He jacked someone and stabbed him." To Cathy "jack" meant to beat someone up, although an experienced police officer testified it means to rob someone. Cathy overheard Terry tell his sister on the telephone that he had stabbed someone and to look out on the street. His sister lived on Buford at 104th Street. Terry later told Cathy he did it "by the jungle." Terry seemed to be high on drugs. Allison Merideth, a friend of Murphy, asked Terry the next day what he had done the night before and he told her he stabbed an old man.

The following evidence was introduced in Murphy's case only. The police interviewed Murphy three times. In the first interview, Murphy said he was riding in a car with a friend when he saw two men beating and kicking a man on the south side of 104th Street. They ran off with the man's pants. Upon further questioning, Murphy modified his story. He said he was walking south on Buford with two companions when they observed the victim exit the driveway of his apartment building and begin to walk southbound on Buford. They followed the victim. The two companions began discussing the possibility of robbing this individual. Murphy told his companions he was not in favor of that. They followed the victim westbound on 104th Street, when suddenly his two companions bolted forward and ran up to the victim and began striking him about the head and upper body. The victim ran to the south side of the street, and his companions followed him and continued to attack him. Murphy said he continued traveling westbound on the north side of 104th Street. He saw one of his companions with a knife and he had no prior knowledge of a knife being there. Murphy described the knife

4

as a kitchen type of food preparation butcher knife.  He did not actually see the stabbing.  One of the individuals had the victim's pants and they ran eastbound on 104th Street to Buford.  Murphy continued eastbound on 104th to Inglewood Avenue and to his home.

When told his story was not consistent with the information the police had, Murphy said that in fact he had crossed to the south side of the street to where the attack was occurring.  He tried to dissuade his companions from the attack.  Murphy indicated his cousin Terry had the knife.  Murphy again stated that he did not see the stabbing.  Murphy said his cousin cut his thumb during the attack and threw the knife into the jungle yard.

Murphy admitted that he had the victim's pants and that he threw them in the driveway.  They ran to the carport area where they climbed up over the top to another street.  They had the victim's wallet and checked its contents.  Murphy thought his fingerprints might be on the wallet.

At the next interview about two weeks later, Murphy gave a statement practically the same as the final version of the previous statement.  When the police indicated that he was not being completely truthful, Murphy identified one of the individuals as Pagus, instead of the name he had used before, Bacus.  He said they had been drinking beer and discussing the possibility of "jacking a basehead" on Buford Street, meaning a rock cocaine dealer or user.  When they saw the victim, Murphy told his companions that he obviously was not a basehead.  His companions attacked the victim and he was with them but he was not involved in the actual attack.  Murphy said he went along because he had to "take care of my cousin."

Terry testified in his defense. He went to a party the evening of February 27 where he drank a couple of 12 packs of beer and smoked PCP. He left after 4:30 a.m. with an individual he met at the party and his cousin Murphy. As they walked along they saw the victim on the other side of the street. The victim said something to Terry. He did not understand him because it was in Spanish. Terry went across to the victim and asked him what he needed. Murphy stayed behind. The victim's voice got louder, and he hit Terry. Terry fell down and his companion helped him up and argued with the victim. The victim reached into his pocket and pulled out an object that looked like a knife. Terry panicked and tried to hit the object out of the victim's hand. They struggled and Terry pulled out his knife which he carried for protection in this gang area. Terry hit the victim twice with his knife while facing him. He ran with his companions to the back of the apartments and discovered his thumb was cut badly. He wrapped it in his T-shirt. He threw the knife into the jungle.

## II. Murphy's 1993 Conviction for Murder

Both Murphy and Terry originally were charged with one count of murder (§ 189, subd. (a)) with a felony-murder special circumstance allegation (§ 190.2, subd. (a)(17)). Prior to trial, the court granted the People's motion to dismiss the special circumstance allegation as to Murphy.

In 1993, following the joint trial before separate juries, Murphy and Terry were each found guilty of first degree murder. The jury in Terry's trial also found the felony-murder special circumstance allegation against him to be true. Terry was sentenced to a term of life without the possibility of parole.

Murphy was sentenced to a term of 25 years to life for the murder, plus five years for a prior serious felony conviction.

Murphy and Terry each filed an appeal from their judgment of conviction. In 1995, this court affirmed both judgments in an nonpublished opinion.

### III. Murphy's 2019 Petition for Resentencing

On January 2, 2019, represented by counsel, Murphy filed a petition for resentencing pursuant to section 1170.95. Murphy asserted he was entitled to relief under the newly-enacted statute because he was convicted of first degree felony murder, he was not the actual killer, he did not act with an intent to kill, and he was not a major participant in the underlying felony who acted with reckless indifference to human life. On March 4, 2019, the People filed two oppositions to the petition. In one opposition, the People argued section 1170.95 was unconstitutional. In the other, the People contended Murphy was ineligible for resentencing because he was a major participant in the robbery and acted with reckless indifference to human life. On March 14, 2019, Murphy filed replies to the People's oppositions.

### IV. The March 15 and 19, 2019 Hearings on the Petition

On March 15, 2019, the trial court held a hearing on the petition. The court began by ruling that section 1170.95 was unconstitutional because it violated the Victims' Bill of Rights Act of 2008: Marsy's Law (hereafter Marsy's Law). The court then turned to the question of whether Murphy was a major participant in the underlying felony. The prosecutor asked the court whether the purpose of the hearing was to make a prima facie finding on Murphy's eligibility under section 1170.95, and if so, whether it intended to issue an order to show cause (OSC).

7

The court responded that the hearing should not be called "a prima facie finding," but rather a "hearing on the petition" where the People "have the burden of showing that the defendant . . . doesn't deserve the benefit of the statute because he was a major participant . . . in a robbery that [led] to the [victim's] death."

The prosecutor sought further clarification, noting that under the statute, once the court makes a prima facie finding and issues an OSC, the People have an opportunity to present evidence at a hearing. When the court inquired whether she planned to present any evidence, the prosecutor stated that she did not intend to "at this hearing," and was not certain if she might do so at a later time. The court told the prosecutor that the "evidence is the record of conviction," and "[y]ou don't call witnesses." The court also stated that it had already made a prima facie finding or else it "would not have scheduled this" hearing, and "would not bring lawyers back to court over and over again if [it] thought there was no prima facie case."

The prosecutor reiterated that the court still had to issue an OSC and afford the People an opportunity to call witnesses. The court asked, "What makes you think you have the right to call witnesses?" When the prosecutor responded that section 1170.95 allows the court to consider the record of conviction as well as other evidence, the court expressed concern that Murphy would be entitled to a jury trial on his eligibility for relief under the statute if additional witnesses were called. The court also explained that because Murphy "stands convicted of a crime based on evidence that was presented to a jury," the court would "need to look at the evidence that was presented to the jury and decide whether [the People] can show beyond a reasonable doubt

8

that he was a major participant." After additional discussion about section 1170.95, subdivision (d)'s provision for a hearing to decide whether to vacate the murder conviction and resentence the petitioner, the court stated, "So, that's what today's hearing was."

When the court asked how much time the People would need to prepare for the hearing, the prosecutor indicated that she needed to determine whether the trial transcripts were available since the court previously had ruled that the preliminary hearing transcript was not admissible. The court noted that it was unlikely that the prosecutor would be able to find the trial transcripts given that Murphy's counsel had been unable to do so. The court advised the prosecutor, "My expectation is that you're not going to have other evidence of the record of conviction other than what's in the appellate decision. And I don't want to deny you the chance to try to find something and convince me I should rely on it, but I don't think that you will."

Murphy's counsel objected to any request by the People for additional time to prepare for the hearing. Citing the language of section 1170.95, the prosecutor reiterated that the People were entitled to file a response to the petition before a prima facie finding was made, and that the court was required to issue an OSC before holding an evidentiary hearing on the petition. The court responded, "So I'm ordering you to show cause. I'm ordering you to show cause next week. [¶] Defense counsel, pick a date." After Murphy's counsel requested a March 19 hearing date, the court stated, "The People are ordered to show cause on the 19th why this petition should not be granted."

At the March 19, 2019 hearing, the People requested a continuance. The prosecutor indicated that she was still

9

attempting to locate the trial transcripts as well as awaiting a response from the victim's family about whether they wanted to participate in the proceedings.  She also emphasized that, under section 1170.95, the People had a right to present new evidence at the hearing on the petition once a prima facie finding was made.  Murphy's counsel objected to the request for a continuance.  Noting that the parties had already made multiple appearances before the court, Murphy's counsel argued it was not reasonable for the prosecutor to believe the March 15 hearing was merely for a prima facie showing of entitlement to relief.

The trial court granted the request for a continuance, stating, "So I'm finding good cause to grant an extension to the People as requested, and the hearing on the petition, that is the issue of major participation which is the only issue yet to be decided[,] will be on April the 3rd.  And either side who plans to present evidence that I don't already have should have that evidence available.  [¶]  The record of the opinion of the Court of Appeal is already before me.  I think that's all that's before me that's admissible that I've seen so far.  [¶] . . . [¶] . . . [I]f you find the record of the trial testimony, I will certainly consider that if you want to call new witnesses.  I'm not saying that I would prevent you, but I have serious doubts whether I should base any decision on what some new witness says to me that wasn't said before a jury.  And it's going to be hard to know whether that witness did say that before [the] jury, if we don't have the transcript."

## V.    The April 3, 2019 Hearing on the Petition

At the April 3, 2019 hearing, the trial court reiterated its prior ruling that section 1170.95 was unconstitutional, and then asked if the parties were ready to proceed on the issue of whether

10

Murphy was a major participant in the underlying felony. The prosecutor explained she had been unable to obtain the trial transcripts, and was ready to argue the issue based on the record in the prior appellate opinion. The prosecutor asked the court, however, to consider the preliminary hearing transcript in ruling on the petition. Murphy's counsel objected to the prosecutor's request on several grounds, including that the preliminary hearing transcript was inadmissible hearsay. Murphy's counsel also pointed out that the People were permitted "to call witnesses and put on evidence," and that there was no showing the relevant witnesses were unavailable. After expressing its concerns about the admissibility of evidence that was never presented to the jury, the court stated, "I don't plan to rely on the preliminary hearing transcript. I don't have anything other than the appellate opinion to give me the facts of the case."

The court then revisited the question of whether the jury had a role at the evidentiary hearing under section 1170.95. After an extended discussion of that issue, the court asked the parties to address whether the People had proved Murphy was a major participant in the underlying felony based on the prior appellate opinion and the criteria set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*).

The parties and the court engaged in a lengthy discussion of whether Murphy was a major participant under each of the *Banks* factors. The court observed that Murphy was present when the robbery was planned, and that there was nothing in the record to suggest he tried to stop it. The court acknowledged, however, that the record was not clear about Murphy's motive in trying to dissuade his companions from targeting the victim by telling them that he was obviously not a drug dealer. The court

11

noted that there was no evidence Murphy had a role in using or supplying lethal weapons, though he was aware of the presence of a knife at the scene. The court also noted that Murphy knew his codefendant, Terry, because they were cousins, and inferred that Murphy must have known Terry to be a violent person since they planned a robbery together. While the court believed Murphy facilitated the robbery by acting as the lookout, it could not determine from the record whether he facilitated the murder or was in a position to prevent it from occurring.

The court considered Murphy's actions after the murder to be "the most harmful" for the defense. The court described Murphy's conduct in touching the victim's pants and wallet as "holding the man's property with his blood on your hands," and characterized such conduct as "borderline ghoulish." The court also surmised that, if Murphy had not been on board with the murder, he would have been horrified by it, but instead he "plunge[d] [his] hands into the dead man's blood and literally pick[ed] his pockets." Murphy's counsel pointed out that the record was not clear whether Murphy took the pants and wallet directly from the victim or obtained them from one of his coparticipants in the crime. In response, the court stated, To "me it doesn't matter. Why would you put the blood of this innocent dead man on your hands, if you're not part of what just happened?"

Murphy's counsel noted that, to be liable for felony murder, a major participant in the felony must also act with reckless indifference to human life. The court replied, "So I don't think he acted with reckless indifference since the killing occurred independent of his physical activity. [¶] The question is did his participation as a lookout and as a planner and in accompanying

12

people who were out robbing lead to the death?  Seems to me it did."  When Murphy's counsel reiterated that Murphy must have acted with reckless indifference to be ineligible for resentencing, the court stated, "The stabbing he may not have acted with reckless indifference, but in the overall crime, doesn't his conduct afterward suggest that he did?"

The prosecutor argued that Murphy's conduct after the murder showed his reckless indifference because he took the victim's pants and searched through his wallet and then fled the scene with his two companions.  The prosecutor also pointed out that, after the murder, Murphy went to sleep and spent the next day with the actual killer, his cousin Terry.

While the court acknowledged that "what happens after [the victim is] already killed certainly doesn't change things," it reasoned that an accomplice's behavior after the murder remains an important factor under *Banks* "as a reflection to your conduct." The court concluded, "I think you could tell my inclination is to find Mr. Murphy a major participant.  I still feel that he should not be denied the benefit of the statute because I don't think a judge sitting without a jury and without a record of exactly what the jury heard should deny him the benefit of the statute."  The court ordered the People to offer Murphy a jury trial on "the special finding of whether he was a major participant," but stayed any such trial until the court of appeal could review its ruling on the petition.

Following the denial of his section 1170.95 petition, Murphy filed a timely appeal.

13

## DISCUSSION

Murphy challenges the trial court's denial of his section 1170.95 petition on several grounds.  He contends the trial court erred in concluding that section 1170.95 was unconstitutional.  He also argues the court erred in failing to follow the multi-step procedure set forth in the statute and to allow the parties an opportunity to present new or additional evidence.  In addition, Murphy asserts the evidence on which the court relied in denying the petition failed to establish that he was a major participant in the robbery who acted with reckless indifference to human life.  For the reasons set forth below, we conclude Murphy was entitled to relief under section 1170.95 because the evidence before the trial court was insufficient to support a finding that Murphy acted with reckless indifference to human life.

## I.    Governing Legal Principles

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) amended murder liability under the felony murder rule and natural and probable consequences doctrine.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; *People v. Tarkington* (2020) 49 Cal.App.5th 892, 897, review granted Aug. 12, 2020, S263219; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 323, review granted Mar. 18, 2020, S260493.)  Prior to Senate Bill 1437's enactment, under the felony murder rule, "a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state."  (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–248.)  Similarly, under the natural and probable consequences doctrine, a defendant was "liable for murder if he or

she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*Id.* at p. 248.)

Senate Bill 1437 amended the felony murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration or attempted perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor in the murder; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (See *People v. Gentile*, *supra*, 10 Cal.5th at p. 842.) It amended the natural and probable consequences doctrine by adding section 188, subdivision (a)(3), which states that malice shall not be imputed to a person based solely on his or her participation in a crime. (*Id.* at p. 843.)

Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony murder or natural and probable consequences theory may petition the sentencing court to vacate the murder conviction and resentence the petitioner on any remaining counts. A petitioner is eligible for relief under section 1170.95 if he or she: (1) was charged with murder by means of a charging document that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) was convicted of first or second degree murder; and (3) could no longer be convicted of first or second degree murder due to the changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1170.95, subd. (a).)

15

Once a petitioner makes a prima facie showing that he or she is entitled to relief, the sentencing court must issue an order to show cause (§ 1170.95, subd. (c)), and hold a hearing to determine whether to vacate the murder conviction and resentence the petitioner (§ 1170.95, subd. (d)(1)).  At that hearing, the prosecution has the burden of proving beyond a reasonable doubt the petitioner is ineligible for resentencing (§ 1170.95, subd. (d)(3)), that is, the People must prove beyond a reasonable doubt that the petitioner is guilty under a theory that remains valid after Senate Bill 1437's enactment.  (See *People v. Clements* (2021) 60 Cal.App.5th 597, 615, review granted Apr. 28, 2021, S267624; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 230, review granted Mar. 10, 2021, S266652; *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, S265974; but see *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309 [holding substantial evidence standard applies at § 1170.95, subd. (d)(3) hearing].)  Both the prosecution and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.  (§ 1170.95, subd. (d)(3).)  A prior appellate opinion is part of the record of conviction that the court may consider in deciding whether the petitioner is entitled to relief.  (*Clements*, at p. 612; *People v. Tarkington*, *supra*, 49 Cal.App.5th at p. 899, fn. 5; *People v. Verdugo*, *supra*, 44 Cal.App.5th at p. 333.)  If the prosecution fails to sustain its burden of proof, the court must vacate the murder conviction and any allegations and enhancements attached to it, and resentence the petitioner on the remaining counts.  (§ 1170.95, subd. (d)(3).)

On appeal from an order denying a section 1170.95 petition following an evidentiary hearing, we review the superior court's

16

factual findings for substantial evidence. (*People v. Clements*, *supra*, 60 Cal.App.5th at p. 618; *People v. Rodriguez, supra*, 58 Cal.App.5th at p. 238.) "We ' " "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 618.)

## II.  Section 1170.95 Is Constitutional

Murphy asserts, and the Attorney General agrees, that the trial court erred to the extent it denied Murphy's petition on the ground that section 1170.95, as enacted through Senate Bill 1437, is unconstitutional. Appellate courts uniformly have rejected challenges to Senate Bill 1437's constitutionality. (See, e.g., *People v. Marquez* (2020) 56 Cal.App.5th 40; *People v. Johns* (2020) 50 Cal.App.5th 46; *People v. Prado* (2020) 49 Cal.App.5th 480; *People v. Bucio* (2020) 48 Cal.App.5th 300; *People v. Solis* (2020) 46 Cal.App.5th 762; *People v. Cruz* (2020) 46 Cal.App.5th 740; *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270; *People v. Lamoureux, supra*, 42 Cal.App.5th 241.) We find the reasoning in these cases persuasive, and likewise conclude that section 1170.95 is constitutional.

## III.  Murphy Has Not Shown the Trial Court Prejudicially Erred in Failing to Strictly Comply with the Multi-Step Procedure Set Forth in Section 1170.95.

Murphy argues the trial court further erred in denying his petition because it failed to comply with the specific procedure set forth in section 1170.95. In particular, he contends the trial court failed to first determine whether he had made a prima facie

17

showing that he was entitled to relief, and then schedule an OSC hearing where the prosecution had the burden to prove he was ineligible for resentencing.  Murphy also claims the trial court failed to provide the parties with an opportunity to present new or additional evidence at the OSC hearing.

The record reflects that, at the start of the March 15, 2019 hearing on Murphy's petition, there was some confusion about the procedural posture of the case.  When the prosecutor inquired whether the purpose of the March 15 hearing was to determine whether a prima facie showing had been made, the court explained it had already made a prima facie finding that Murphy was entitled to relief, and the purpose of the hearing was to decide whether the People proved that Murphy was ineligible for resentencing because he was a major participant in the underlying felony.  It thus appears that the trial court initially intended to hold the hearing prescribed by section 1170.95, subdivision (d) without first issuing an order to show cause, as required by subdivision (c).  By the conclusion of the March 15 hearing, however, the trial court had corrected its procedural misstep.  After the prosecutor pointed out that the express language of the statute required the court to issue an order to cause before holding a section 1170.95, subdivision (d) hearing, the court agreed to set the matter for such a hearing on March 19.  The court also made clear it was ordering the prosecution to show cause at that hearing why Murphy's petition should not be granted.

On March 19, the trial court granted the People's request to continue the hearing to April 3 to allow the prosecutor additional time to search for relevant evidence.  On April 3, a date within 60 days after the order to show cause was issued, the court held the

18

section 1170.95, subdivision (d) hearing at which the People had the burden of proving beyond a reasonable doubt that Murphy was ineligible for resentencing. Therefore, despite some initial confusion about the proper procedure, the trial court ultimately complied with the multi-step process set forth in section 1170.95 by first making a prima facie finding of Murphy's entitlement to relief, then issuing an order to show cause, and finally holding a hearing to determine whether to vacate Murphy's murder conviction and resentence him.

Moreover, Murphy has not shown he suffered any prejudice related to the trial court's initial failure to issue the order to show cause. At both the March 15 and 19 hearings, Murphy's counsel advised the court that the defense was ready to proceed with the hearing prescribed by section 1170.95, subdivision (d), and urged the court to move forward with that hearing without further delay. Indeed, in opposing the prosecutor's request to continue the March 15 hearing for procedural compliance with the statute, Murphy's counsel asserted that "the defense has been diligent in preparing and understood what this court date was for."

Murphy also argues the trial court failed to comply with section 1170.95 because it did not permit the parties to introduce evidence outside the record of conviction. It is true that, at the March 15 hearing, the trial court indicated that it believed the admissible evidence at the section 1170.95, subdivision (d) hearing was limited to the record of conviction, and that the parties were not allowed to call witnesses because it would implicate the right to a jury trial. While the court expressed similar concerns at the March 19 hearing, it also stated it would decide whether to permit additional evidence at the April 3 hearing. The court thus advised the parties, "[E]ither side who

19

plans to present evidence that I don't already have should have that evidence available."

At the April 3 hearing, neither the prosecution nor the defense sought to introduce any new or additional evidence outside of the record of conviction. While the prosecutor argued the preliminary hearing transcript should be considered as part of the record of conviction, Murphy's counsel objected to its admission on hearsay and other grounds. Murphy's counsel also noted that "the People have the ability to call witnesses and put on evidence." The defense never suggested it had any witnesses or other evidence that it wished to introduce at the section 1170.95, subdivision (d) hearing. Nor did the defense raise any objection to the trial court's decision to proceed solely on the prior appellate opinion. Rather, the totality of the record reflects that Murphy's position at each hearing on his petition was that the People had the burden of proof, and that the record of conviction did not establish beyond a reasonable doubt that Murphy was a major participant in the underlying felony who acted with reckless indifference to human life.

Because Murphy never proffered any new or additional evidence for the trial court to consider at the section 1170.95, subdivision (d) hearing, he has forfeited any argument that the court erred in failing to allow such evidence. (See Evid. Code, § 354, subd (a) [judgment or decision shall not be reversed for erroneous exclusion of evidence unless the "substance, purpose, and relevance of the excluded evidence was made known to the court by . . . an offer of proof, or by any other means"]; *People v. Johnson* (2018) 6 Cal.5th 541, 571 [defendant forfeited any claim about purported exclusion of evidence by "failing to offer it in evidence below"].) Even assuming the claim was preserved,

20

Murphy has not shown it is reasonably probable that the trial court would have reached a different result in the absence of the alleged error. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 131 [erroneous exclusion of evidence reviewed for prejudice under state law standard articulated in *People v. Watson* (1956) 46 Cal.2d 818]; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 [same].) Murphy has not identified any evidence that he was precluded from introducing at the section 1170.95, subdivision (d) hearing, nor has he suggested the existence of any evidence that he would offer at such a hearing on remand. Under these circumstances, any error by the trial court in failing to allow the parties to present new or additional evidence outside the record of conviction was harmless.[3]

## IV. The Trial Court Erred in Denying the Section 1170.95 Petition Because the Evidence Was Insufficient to Establish Murphy's Ineligibility for Resentencing

Murphy also challenges the sufficiency of the evidence supporting the trial court's finding that he was ineligible for resentencing under section 1170.95. He contends the evidence in the prior appellate opinion was insufficient to prove that he was a major participant in the robbery who acted with reckless indifference to human life, and the trial court's speculation about his mental state and conduct after the crime was not supported

---

[3] Neither Murphy nor the Attorney General argues on appeal that the trial court erred in ruling that the preliminary hearing transcript was inadmissible because it was not part of the record of conviction. Accordingly, we express no opinion about the admissibility of a preliminary hearing transcript at a hearing held under section 1170.95, subdivision (d).

by the record.  The Attorney General argues that the trial court properly denied the section 1170.95 petition because there was substantial evidence in the appellate opinion to support the court's express finding that Murphy was a major participant in the robbery, as well as its implied finding that Murphy acted with reckless indifference to human life.

## A.    *Relevant Law*

Section 189, subdivision (e)(3), provides that a participant in certain felonies, including robbery, in which a death occurs is liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2," the felony-murder special circumstance statute.  Section 190.2, subdivision (d), in turn states that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant" aids or abets an enumerated felony, including robbery, that results in death may be convicted of special circumstance murder and sentenced to death or imprisonment for life without parole.  "The statute, by its text, imposes an actus reus requirement, major participation in the enumerated felony, and a mens rea requirement, reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

More than two decades after Murphy's trial and conviction, the California Supreme Court in *Banks*, *supra*, 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, 609 (*Clark*) clarified the meaning of the " 'major participant' " and " 'reckless indifference' " requirements of section 190.2, subdivision (d).  In *Banks*, the Supreme Court identified a nonexclusive list of factors for  determining whether an aider and abettor was a major participant in the underlying felony:  "What role did the

22

defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.)  With respect to the "[r]eckless indifference" element, the court explained that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " (*Id*. at p. 807.)  "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies" the mens rea requirement.  (*Id*. at p. 808.)

Applying these principles, the *Banks* court held the evidence was insufficient to establish the defendant, a getaway driver in an armed robbery that resulted in a fatal shooting, was a major participant in the robbery or acted with reckless indifference to human life.  (*Banks*, *supra*, 61 Cal.4th at pp. 805–807.)  The defendant did not qualify as a major participant because there was no evidence that he planned the robbery, had any role in procuring weapons, knew whether his confederates had committed prior violent crimes, was present at the scene of the crime, or could have prevented the shooting from occurring.  (*Id*. at p. 805.)  The defendant's awareness of the risk of death inherent in an armed robbery was insufficient to show reckless

23

indifference because there was no evidence that he "knew his own actions would involve a grave risk of death." (*Id.* at p. 807.)

The following year, in *Clark*, *supra*, 63 Cal.4th at pages 616 to 618 the Supreme Court further elaborated on the mental state required to demonstrate reckless indifference to human life. As the court explained, the " 'reckless indifference' " element of a felony-murder special circumstance finding "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The requisite state of mind is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) Reckless indifference to human life thus has both a subjective and objective component. (*Id.* at p. 617.) Subjectively, the defendant must consciously disregard risks known to him or her. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether the defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*) The fact that a robbery involved a gun, by itself, is insufficient to support a finding of reckless indifference to human life. (*Id.* at pp. 617; see *Scoggins*, *supra*, 9 Cal.5th at p. 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life"].)

*Clark*, *supra*, 63 Cal.4th at pages 618 to 623 also provided a nonexclusive list of factors to consider in evaluating whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the

24

defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)  Like the *Banks* factors, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' "  (*Clark*, at p. 618.)

Applying these factors, *Clark*, *supra*, 63 Cal.4th at pages 612, 614 held there was insufficient evidence to support a finding that the defendant, the "mastermind" who planned and organized a store robbery that ended in a fatal shooting, acted with reckless indifference to human life.  Despite the defendant's significant involvement in planning the crime, the evidence showed he attempted to minimize the likelihood of violence by timing the robbery to occur after the store was closed and planning the use of one unloaded gun.  (*Id*. at pp. 621–622.)  At the time of the shooting, the defendant was not present in the store, was unaware that the shooter had loaded the gun with a single bullet, and had no prior knowledge that the shooter was likely to engage in violence.  (*Id*. at pp. 619–621.)  The court thus concluded there was "nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.)

More recently, our Supreme Court considered the reckless indifference element of section 190.2, subdivision (d) in *Scoggins*, *supra*, 9 Cal.5th 667.  *Scoggins*, at page 676, held the evidence

25

was insufficient to establish that the defendant acted with reckless indifference to human life where he planned an unarmed assault and robbery and one of his accomplices deviated from the plan and killed the victim. The victim previously had swindled the defendant in a sales transaction, and to exact revenge, the defendant recruited two friends to ambush the victim, " 'beat the shit' " out of him, and retrieve the defendant's money. (*Id*. at p. 671.) As planned, the attack took place in a strip mall parking lot while the defendant waited at a nearby gas station. When the victim arrived, however, one of the defendant's accomplices unexpectedly pulled out a gun and shot him. (*Id*. at pp. 671–672.) The defendant had no knowledge a gun would be used in the attack or that his accomplices were likely to engage in lethal force, was not present at the scene of the shooting or in a position to restrain the shooter, and had attempted to minimize the risk of death by planning for the assault to occur in a public place in broad daylight. (*Id*. at pp. 677–678, 681–683.) Based on these facts, the court concluded the defendant "did not 'knowingly creat[e] a "grave risk of death." ' " (*Id*. at p. 683.)

**B.** ***The Evidence Was Insufficient to Support a Finding that Murphy Acted with Reckless Indifference to Human Life***

In denying Murphy's section 1170.95 petition, the trial court found Murphy was ineligible for resentencing under the statute because he was a major participant in a robbery that led to the victim's death. The trial court never made a finding that Murphy acted with reckless indifference to human life, as now required to be liable for felony murder under section 189, subdivision (e). While the Attorney General asserts the trial court made an implied finding of reckless indifference at the

26

April 3 hearing, the record suggests otherwise given the court's express statement at the hearing that it did not believe Murphy "acted with reckless indifference since the killing occurred independent of his physical activity."

For purposes of this appeal, however, we need not decide whether the trial court made an implied finding of reckless indifference to human life. We also need not determine whether there was sufficient evidence to support the trial court's express finding that Murphy was a major participant in the robbery. Even assuming that the necessary findings were made, and that the evidence was sufficient to establish that Murphy was a major participant, there was no substantial evidence that Murphy acted with reckless indifference to human life. The trial court therefore erred in denying Murphy's petition on the ground that he was ineligible for resentencing under section 1170.95.

First, Murphy did not use a weapon in the robbery, nor did he supply any weapons to his coparticipants in the crime. At some point, Murphy did become aware that his cousin, Terry, was armed with a knife. However, the prior appellate opinion is unclear about when that occurred. According to the opinion, Murphy told the police that, during the assault, he "saw one of his companions with a knife and he had no prior knowledge of a knife being there." Murphy later disclosed that "Terry had the knife," but he "again stated that he did not see the stabbing." Terry testified that Murphy "stayed behind" during the attack, and that Terry "pulled out his knife which he carried for protection" as he struggled with the victim. Yet even assuming Murphy was aware that Terry was carrying a knife before the robbery began, there is nothing in the record about Murphy's own knowledge or use of weapons that suggests he "appreciated the

27

planned robbery posed a heightened risk of death." (*In re Taylor* (2019) 34 Cal.App.5th 543, 558.) The "mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 618.)

Second, although Murphy was present at the scene of the robbery, the record is ambiguous about his precise location and whether he had an opportunity to act as a restraining influence on his companions or to render aid to the victim. As set forth in the appellate opinion, Murphy initially told the police that he stayed across the street as his companions chased and attacked the victim. He later admitted that "in fact he had crossed to the south side of the street to where the attack was occurring." However, as the trial court observed, Murphy's position on the "same side of the street" as his cohorts "could be a hundred yards, it could be 20 yards, it could be [10] feet," and given the sudden nature of the stabbing, "it doesn't seem like [he] was in a position to stop [it]." Moreover, while Murphy's account of his location at the scene evolved over the course of his police interviews, he maintained in each of his interviews that he "was not involved in the actual attack," and "he did not see the stabbing" occur. Accordingly, while the evidence could support a finding that Murphy was in close proximity to the fatal stabbing of the victim, it did not show he was close enough to act as a restraining force on the crime or his companions. (See, e.g., *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [defendant may have been able to see and hear what was happening at scene of shooting, but he was not "close enough to exercise a restraining effect on the crime or his colleagues"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 [where defendant was across the street from shooting and did not

see it occur, he "was never in close enough proximity to act as a restraining influence"].)

Third, there is no evidence that the duration of the crime created a heightened risk for violence. As the Supreme Court explained in *Clark*, *supra*, 63 Cal.4th at page 620, courts have considered "whether a murder came at the end of a prolonged period of restraint of the victims by defendant" in assessing whether the defendant acted with reckless indifference to human life. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Ibid.*) In this case, it appears the duration of the crime was short. Murphy's two companions began striking the victim as soon as they caught up to him, and Terry then stabbed him twice with a knife. Terry also testified that the stabbing occurred during a struggle after the victim suddenly pulled a knife from his own pocket. Although a reasonable factfinder could disbelieve Terry's version of events, there is nothing in the record to suggest that the stabbing came at the end of a prolonged period of restraint, or was an expected part of the planned robbery. (See, e.g., *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558 [reckless indifference absent where evidence tended to show "the shooting was a 'somewhat impulsive' response to the victim's unexpected resistance"]; *In re Miller* (2017) 14 Cal.App.5th 960, 975 [duration of crime counseled against finding reckless indifference where killing "appeared to be somewhat impulsive" and "occurred when the shooter was unexpectedly confronted"].)

Fourth, there is no evidence that Murphy knew his companions were likely to use lethal force. While Terry was

Murphy's cousin, the record does not contain any evidence showing that Terry or the other accomplice in the robbery had a prior history of violence, or that Murphy was aware of any such history. There is also no evidence that Murphy had previously committed any crimes with either of his companions. In ruling on Murphy's section 1170.95 petition, the trial court surmised that Murphy must have known Terry "to be a violent person obviously since they planned a robbery together." However, the fact that Murphy planned the robbery with Terry does not support an inference that Murphy had any prior knowledge of his cousin's violent conduct. As the Supreme Court observed in *Scoggins*, *supra*, 9 Cal.5th at page 682, "[e]ven if [the defendant] knew that [his cohorts] were prone to some degree of violence, and even though the planned assault of [the victim] necessarily contemplated the use of violence, the evidence does not support a finding that [the defendant] acted with reckless indifference to human life." (See *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558 [although defendant was "good friends" with shooter and likely aware of his involvement in illegal activity, such evidence did not show defendant knew of prior violent behavior on shooter's part]; *In re Ramirez*, *supra*, 32 Cal.App.5th at p. 405 [defendant's knowledge that killer was a gang member "says nothing about [his] knowledge of his cohorts' likelihood of killing"]; *In re Miller*, *supra*, 14 Cal.App.5th at p. 976 ["[e]ven though defendant and [the killer] belonged to the same gang and had committed . . . robberies together in the past, '[n]o evidence indicated [they] had ever participated in shootings, murder, or attempted murder' "].)

Fifth, the record is ambiguous about what efforts, if any, Murphy may have made to minimize the risk of violence. In his

initial interview with the police, Murphy stated that when his two companions began discussing the possibility of robbing the victim, Murphy told them "he was not in favor of that." Murphy also asserted that during the assault on the victim, he "tried to dissuade his companions from the attack." In a later interview, Murphy recounted that he and his companions had been discussing the possibility of robbing a "basehead," meaning a drug dealer or user, and when they saw the victim, he "told his companions that he obviously was not a basehead." Murphy's statements about his role in the crime, if believed, could support an inference that he tried to minimize the risk of violence by discouraging his companions from targeting the victim or using deadly force. Even if Murphy's account is disbelieved, however, there is no evidence from which it reasonably can be inferred that he "harbored a willingness to kill, or to assist his confederates in killing, to achieve the goal of robbing someone, or that he anticipated the potential for loss of human life beyond that usually accompanying an armed robbery." (*In re Ramirez, supra*, 32 Cal.App.5th at pp. 405–406.)

In finding that Murphy was ineligible for relief under section 1170.95, the trial court relied heavily on his conduct following the stabbing. Our Supreme Court has recognized that a "defendant's actions after the [killing] may also bear on the defendant's mental state." (*Scoggins, supra*, 9 Cal.5th at p. 679.) On the other hand, where there is ambiguity in the defendant's postkilling conduct, it can " 'make it difficult to infer his frame of mind concerning [the victim's] death.' " (*Id*. at p. 680.) Here, Murphy's actions after the murder of the victim were somewhat ambiguous. According to the appellate opinion, Murphy admitted that after the stabbing "he had the victim's pants and that he

31

threw them in the driveway. . . . They had the victim's wallet and checked its contents. Murphy thought his fingerprints might be on the wallet." In the legal discussion, the opinion also stated that Murphy "took the victim's pants and looked through his wallet." The record is unclear, however, about the specific circumstances surrounding Murphy's contact with the victim. As Murphy's counsel pointed out at the hearing on the petition, "we do know that he ended up with the wallet or touched it [at] some point, but we don't know at what point that was, if Mr. Terry or the third unidentified person took those items, gave them to Mr. Murphy, told him to hold them. We don't know any of the circumstances of that."

Based on Murphy's contact with the victim's property after the killing, the trial court inferred that Murphy must have "plunge[d] [his] hands into the dead man's blood and literally pick[ed] his pockets." The court also imagined Murphy "holding the man's property with his blood on [his] hands," and "tak[ing] the proceeds of the murderous robbery and run[ning] [his] fingers through it." However, the record is devoid of evidence supporting this version of events. There is nothing in the appellate opinion from which it reasonably can be inferred that Murphy "pick[ed] [the] pockets" of the victim after the stabbing, "plung[ed] [his] hands" into the victim's body, or had the victim's "blood on [his] hands." The opinion made no mention of when or how Murphy obtained the victim's wallet or pants, nor of blood being anywhere on Murphy's person. "To be relied upon in a determination whether evidence is substantial, an inference 'must be reasonable. An inference is not reasonable if it is based only on speculation.' [¶] . . . [¶] ' "[S]peculation is not evidence, less still substantial evidence." ' " (*In re Ramirez, supra*, 32 Cal.App.5th

32

at pp. 404–405.)  Here, the trial court's vivid mental image of how Murphy may have come into contact with the victim's property was unsupported by substantial evidence.

Notwithstanding the trial court's speculation, the facts set forth in the appellate opinion could support an inference that Murphy took the victim's pants from his body after the stabbing and searched through his wallet.  On the other hand, the record also could support an inference that Murphy acquired the victim's property from his companions as they were fleeing the scene.  As the Supreme Court cautioned in *Scoggins*, *supra*, 9 Cal.5th at page 679, "when different inferences may be drawn from the circumstances, the defendant's actions after the [killing] may not be very probative of his mental state."  In this case, the ambiguous circumstances surrounding Murphy's postkilling conduct " 'make it difficult to infer his frame of mind.' " (*Id*. at p. 680.)  Yet even assuming Murphy took the victim's property from his deceased body rather than obtaining it from his companions, such conduct, while reprehensible, does not show that Murphy acted with reckless disregard to the risk of human life posed by the planned robbery.  The "governing standard as explained in *Banks* and *Clark* is not satisfied with evidence of a general indifference to human life, but instead with evidence of a *reckless* indifference, which is shown when the defendant knowingly *creates* a serious *risk* of death.  [Citation.]  Thus, even if a defendant is unconcerned that a planned felony resulted in death, . . . there must also be evidence that the defendant's participation in planning or carrying out the crime contributed to a heightened risk to human life." (*In re Taylor, supra*, 34 Cal.App.5th at p. 560.)

Considering the totality of the record before the trial court, the evidence failed to establish that Murphy acted with reckless indifference to human life.  Murphy's culpability in the fatal stabbing of the victim resided in his role as a planner and possibly a lookout for the robbery, "rather than in his actions on the ground in the immediate events leading up to [the] murder." (*Clark*, *supra*, 63 Cal.4th at p. 623.)  While Murphy may have been aware that his companion, Terry, was armed, there was "nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Ibid*.)  Nor, is there any evidence that Murphy had any "direct involvement" in the stabbing itself.  (*In re Taylor*, *supra*, 34 Cal.App.5th at p. 559.)  In sum, there was nothing in the record that showed that Murphy was "aware of and willingly involved in the violent manner in which the [offense was] committed," or that he consciously disregarded "the significant risk of death his . . . actions create[d]." (*Banks*, *supra*, 61 Cal.4th at p. 801.)  Because the evidence was insufficient to support a finding that Murphy acted with reckless indifference to human life, the trial court erred in denying the section 1170.95 petition on the ground that Murphy was ineligible for resentencing.  We accordingly reverse the order denying Murphy's petition and remand the matter for resentencing in accordance with section 1170.95.

## DISPOSITION

The order denying William Cecil Murphy's Penal Code section 1170.95 petition is reversed and the matter is remanded to the superior court. On remand, the superior court shall enter a new order granting the petition and vacating Murphy's murder conviction under section 1170.95, subdivision (d)(2), and shall resentence Murphy in accordance with section 1170.95, subdivision (d)(3).

NOT TO BE PUBLISHED.


KALRA, J.[*]


We concur:



EDMON, P. J.



EGERTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.