Filed 6/13/22 P. v. Quintos CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049174 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS022073) |
| v. | |
| LEO JAVIER QUINTOS, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

Defendant Leo Javier Quintos appeals from the denial of his Penal Code section 1170.95[1] resentencing petition after an evidentiary hearing.  As relevant here, section 1170.95 allows individuals convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime to petition the superior court to vacate the conviction under recent changes to the law that limited murder liability.  (See § 1170.95, subd. (a).)  Defendant pleaded no contest to first degree murder (§ 187) in 2002, and after a bench trial the court found true the allegation that defendant committed the offense for the benefit of, at the direction of, or in association with a criminal street gang.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant contends that the denial order must be reversed because it is unclear whether the superior court required the prosecution to prove beyond a reasonable doubt that he is guilty of murder under current law. Alternatively, defendant contends there is insufficient evidence to support the superior court's determination that he was a major participant in the underlying felony and acted with reckless indifference to human life. The Attorney General contends that the superior court applied the correct standard and that sufficient evidence supports the court's findings.

For reasons that we will explain, we affirm the superior court's denial of defendant's section 1170.95 petition.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Trial Proceedings and Direct Appeal*

In 2002, defendant was charged with murder (§ 187), two counts of attempted carjacking (§§ 215, subd. (a), 664), and two counts of attempted second degree robbery (§§ 211, 664). The complaint alleged that defendant committed each of the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

Defendant pleaded no contest to first degree murder. After a bench trial, the superior court found the gang enhancement true. The court sentenced defendant to 25 years to life consecutive to a 10-year determinate term for the gang enhancement.

Defendant appealed, contending that there was insufficient evidence to sustain the gang enhancement and that the consecutive 10-year term constituted an unauthorized sentence. In case No. H025916, this court upheld the true finding on the gang enhancement but agreed that section 186.22, subdivision (b)(5) precluded the imposition of a consecutive

---

[2] On our own motion, we take judicial notice of the opinion and the appellate record in case No. H047591 and of the opinion in case No. H025916. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

2

10-year term. This court struck the 10-year term, imposed a 15-year minimum parole eligibility under section 186.22, subdivision (b)(5), and affirmed the judgment as modified.

## B. *Section 1170.95 Proceedings at the Prima Facie Stage*

In 2019, defendant filed a section 1170.95 petition for resentencing in the superior court. Defendant declared that "[a]n information was filed against [him] . . . that allowed the prosecution to proceed under a theory of felony murder and/or murder under the natural and probable consequences doctrine"; he "was convicted by way of plea of first degree murder pursuant to the felony murder rule and/or [the] natural and probable consequences doctrine"; and he "could not now be convicted of first or second degree murder because of changes made [t]o . . . section[s] 188 and 189, effective and retroactive, as of January 1, 2019." Defendant also declared that he was not the actual killer, did not aid and abet first degree murder with the intent to kill, and was not a major participant who acted with reckless indifference to human life.

After appointing defendant counsel and receiving written briefing from the parties, the superior court denied the petition, concluding that defendant had failed to establish a prima facie case for relief.

Defendant appealed from the superior court's denial order. In case No. H047591, this court reversed, determining that the superior court improperly engaged in factfinding at the prima facie stage of the proceedings. This court remanded the matter for the issuance of an order to show cause and an evidentiary hearing on defendant's petition (§ 1170.95, subds. (c), (d)).

## C. *Evidence Presented at the Section 1170.95 Evidentiary Hearing*

### 1. Stipulation

The parties stipulated that "[o]n August 1, 2002, . . . Ignacio Sanchez died of a gunshot wound from a gun that . . . Anthony Estrada discharged in the area of Ocean View Boulevard and Eardley Avenue in the city of Pacific Grove, Monterey, California. [¶] [Defendant] and . . . Estrada were the perpetrators, participants in the underlying

3

felonies leading up to . . . Sanchez's death, but [defendant] did not have in his possession a firearm and did not use or discharge a firearm or other weapon during this incident."

### 2. Prosecution Witnesses

The prosecution called three witnesses at the hearing: Sanchez's girlfriend, Witness A,[3] and retired Pacific Grove Police Sergeant Thomas Uretsky.

Sanchez's girlfriend testified that around midnight on August 1, 2002, she and Sanchez went to Monterey and parked near the aquarium. They took a walk to see sharks in a nearby tank. They returned to Sanchez's car and sat there for a few minutes. A vehicle passed them, reversed toward them, and stopped. Two men got out of the vehicle and approached the driver's side of Sanchez's car, where Sanchez was seated.

The men demanded Sanchez's wallet and keys and ordered him out of the car, but Sanchez resisted. As the men tried to force Sanchez from the car, they noticed Sanchez's girlfriend inside the vehicle and one of them went over to her. The man had a gun. The man told Sanchez's girlfriend to get out of the car and forcefully hit her in the face, causing her to feel dizzy and bruising her. When she backed up, the man stepped into the passenger side of the car.

While this was happening, the other man was fighting with Sanchez, "trying to force . . . Sanchez out of the vehicle by physically hitting him." The man in the passenger side then tried to help get Sanchez out of the car. The men "were working together as -- one was trying to pull him and the other trying to push him out of the car." While "the arms [were] swinging," Sanchez's girlfriend heard a gunshot. The man shot the gun from the passenger side toward the driver's position. Sanchez' girlfriend ran to some nearby bushes and hid.

---

[3] Only Witness A's last name appears in the record. We refer to her as "Witness A" pursuant to California Rules of Court, rule 8.90(b)(10).

The man with the gun ran from the passenger side to the driver's side. "[B]oth" of the men were "swinging their arms, hitting . . . Sanchez, trying to do whatever they could to get him out of the car because . . . Sanchez just wouldn't get out." Sanchez's girlfriend heard two to three more gunshots. One of the men took off running and the other got back into the car he came in, which was driven by a woman.

Sanchez's girlfriend ran to Sanchez, who was lying in the middle of the street. Sanchez told her to call 911 because he was bleeding. Sanchez's girlfriend ran to the nearest business hoping it would be open.

Witness A testified that around midnight on August 1, 2002, she was driving with her husband near the aquarium when she saw "somebody stabbing another person." Witness A's husband flashed the car's headlights as he drove toward the individuals. After the couple passed by and stopped at a stop sign, Witness A heard two gunshots. The couple went to a nearby fast-food restaurant and called 911.

Sergeant Uretsky testified that he was dispatched to a possible shooting on August 1, 2002 at approximately 11:48 p.m. When he arrived on scene, an officer was attending to Sanchez, who was lying in the middle of the street 15 to 20 feet from a vehicle with its driver's and passenger doors open. Sanchez was lying in a fetal position and did not have a pulse. Sergeant Uretsky performed CPR to try to revive him. Once medical personnel arrived and cut Sanchez's clothes off, Sergeant Uretsky saw bullet holes to Sanchez's right shoulder, the right side of his lower back, and his arm. Police found shell casings consistent with the bullets recovered during Sanchez's autopsy on the driver's side and passenger side of the vehicle. One of the bullets recovered during the autopsy was located in Sanchez's heart.

Sergeant Uretsky subsequently executed a search warrant at defendant's house, finding a letter Estrada sent to defendant from prison, a firearm, and gang indicia.

Defendant was apprehended in a vehicle stop. Another letter from Estrada to defendant was found inside the vehicle. When police showed Sanchez's girlfriend the

5

vehicle defendant was stopped in, she stated that the "vehicle was most like the vehicle that was at the shooting."

### 3. Prosecution Exhibits

The court admitted two prosecution exhibits into evidence: a transcript of the 2003 bench trial on the gang enhancement and a transcript of defendant's plea hearing.[4] Two witnesses testified at the gang-enhancement bench trial: Sergeant Uretsky and Salinas Gang Intelligence Officer Mark Lazzarini.

Sergeant Uretsky testified at the bench trial[5] that Estrada, Veronica Galvan, and defendant were arrested in conjunction with Sanchez's homicide. Sergeant Uretsky executed a search warrant at Estrada's house. Gang indicia located in Estrada's room was seized, including a jersey with the number 80 and "Salinas" on the back of it and some "SEM or Fremont-type" gang-related sketches. A cell phone was found that displayed " 'Fremont Street' " when opened.

Police also executed a search warrant at defendant's house in Salinas. During a search of defendant's bedroom, police located a .45 caliber automatic handgun wrapped in a red bandana underneath a mattress. A box of ammunition was found on the bedstand. Several photographs of defendant and other individuals at the California Youth Authority (CYA) were found. In one of the photographs, several individuals were making gang signs. A photo album was also located containing gang-related photographs. In another bedroom, police found a black jersey with the number 80 and "Salinas" on it and two articles of San Francisco 49ers clothing.

Officer Lazzarini testified that Salinas East Market, or SEM, and Fremont Street are Norteño gangs. The gangs commit crimes together and identify with Norteño colors and

---

[4] The transcript of the plea hearing is not in the record on appeal.

[5] In our summary of the evidence presented at the gang-enhancement bench trial, we omit evidence that was also elicited during the section 1170.95 evidentiary hearing that we have already summarized above.

symbols. Norteño street gang members' primary activities are homicides, robberies, drive-by shootings, felony assaults, witness intimidation, possession of narcotics and firearms for sale, threats, and arson.

Officer Lazzarini testified that gang members use firearms "for so many reasons," including to further their criminal activity, use against rivals, and to intimidate. Using a gun in a robbery or carjacking spreads fear in the community which benefits the gang because it causes unwillingness to cooperate with law enforcement and to testify against gang members. Willingness to use force with fists or a gun enhances the person's reputation and status within the gang.

Officer Lazzarini testified about two predicate offenses committed by Norteño members: an attempted murder by firearm on July 20, 2001, and a murder by firearm on December 16, 2001. Officer Lazzarini also testified regarding defendant's police contacts, gang associations, and gang-related tattoos, including a northern star on his left shoulder, which signifies that an individual has committed a crime for the benefit of the Norteños. According to Officer Lazzarini, defendant was committed to the CYA in 1997, where he "continue[d] [to] participat[e] in the northern gang subculture" and got additional gang-related tattoos.

Officer Lazzarini stated that inside the photo album found in defendant's room, there were newspaper articles of northern gang members involved in crimes, gang-related photographs, and gang-related drawings. One article pertained to two homicides in Salinas in 1998 committed during a power struggle between the Nuestra Familia and the Norteños.

Officer Lazzarini believed that Estrada and Galvan picked defendant up from CYA when he was released in May 2002. Based on the content of Estrada's letters to defendant, it appeared that Estrada and defendant were friends.

Officer Lazzarini stated that Estrada was an admitted Norteño member and had pleaded guilty to murder in this case and admitted the gang enhancement. Galvan pleaded guilty to being an accessory to murder and admitted a gang enhancement.

7

Officer Lazzarini opined that Estrada and defendant were active Norteño criminal street gang members in August 2002 and that this offense was committed in association with and for the benefit of the Norteño criminal street gang. Officer Lazzarini stated that based on Galvan's statements, the crime appeared to have been at Estrada's direction because Estrada "dictated what was going to happen and where it was going to take place." Officer Lazzarini testified that there was no evidence that Sanchez's girlfriend was aware that the assailants were gang members or that the assailants wore red, used gang-related language, or made gang signs.

### 4. Defense Case

Defendant did not present evidence at the section 1170.95 evidentiary hearing. After the hearing, defendant submitted several exhibits that the superior court received and considered. In addition to this court's opinion in case No. H025916 and a transcript of the section 1170.95 evidentiary hearing, defendant submitted a report by Pacific Grove Police Officer Borgeson, an interview of Sanchez's girlfriend by District Attorney Investigator Puskaric, and the 2003 probation report prepared in this case.

Officer Borgeson stated in his report that when he arrived on scene and approached Sanchez, who was lying face down in the street, Sanchez's girlfriend ran up to him. In her summary of the events, Sanchez's girlfriend stated that they had gone to that location to see the whales. Afterwards, as they were talking in their car, a Honda Civic driven by a woman with two Hispanic male passengers passed by. The vehicle made a U-turn and parked behind them. One of the men approached the driver's side of Sanchez's vehicle while the other man approached the passenger side. Both of the men pointed a gun. The man on the passenger side said, " '[G]et out, give up your shit,' " pulled Sanchez's girlfriend from the vehicle, and punched her in the face. Sanchez's girlfriend stumbled backwards and the man entered the passenger side of the vehicle. The man in the passenger side then punched Sanchez repeatedly and shot him several times. Sanchez's girlfriend turned away and heard

8

several more shots. When she looked back, she saw one of the men running away. She could not remember what direction the Honda went.

Investigator Puskaric's report stated that he interviewed Sanchez's girlfriend on August 28, 2002, and attached a transcript of the interview. Sanchez's girlfriend told Investigator Puskaric that she and Sanchez went to Monterey to see the sharks. When they were walking back to Sanchez's car, she saw the suspect's vehicle at a stop sign. It was at the stop sign for "[m]ore than a normal stop." The vehicle turned in their direction.

As she and Sanchez were getting into Sanchez's car, the suspects' vehicle slowly passed them and then backed up. Two men got out and approached. Sanchez's door was still open, and Sanchez's girlfriend heard one of the men say, " 'Get out of the car,' " and the other said, " 'Mother fucker.' "

Sanchez's girlfriend stated, "Then they were just hitting him. They were punching him." After hitting Sanchez in the face several times, one of the men looked at Sanchez's girlfriend, told her to get out, and pointed a gun at her. Sanchez told her to get out of the car. As she got out, the man with the gun came over to her and punched her in the face. He leaned into the car, watched Sanchez and the other man struggling, and fired one shot, before going back to the other side of the car. Sanchez's girlfriend noticed that the man looked at her and pointed the gun, so she hid behind some bushes.

Sanchez's girlfriend stated that she heard two shots, one after the other, but she was unsure if they were aimed at her or Sanchez. She then saw a car go down the street and flash its lights. She also heard someone honk. Sanchez's girlfriend heard another shot. She then saw one of the men get back into the suspects' vehicle and the other man run up the street. She did not see where the car went. It all happened "pretty fast." Sanchez was lying in the street and told her to call an ambulance.

The probation report contained a summary of the incident nearly identical to Officer Borgeson's report. It also stated that Sanchez's girlfriend reported that after the suspects

9

fled, she saw Sanchez get out of his car and collapse in the street. Sanchez's girlfriend identified Estrada as the shooter.

The probation report stated that "Witness #1" reported that while driving by, he saw a vehicle with its driver's door open and someone lying on the ground next to it. Two men were punching and kicking the man on the ground. He honked as he passed by. As he continued driving, he saw flashes of light and heard three gunshots. He went to a fast-food restaurant and called 911. The report stated that "Witness #2" was with "Witness #1" and reported the same information, adding that she saw one of the suspects run from the scene.

The probation report stated that Estrada and Galvan were arrested on August 4, 2002, and transported to the police department for questioning. Galvan denied knowledge of the shooting and was released.

Estrada first denied any knowledge of the incident but then stated that he went to "Planet Gemini" with his friend "Smiley" and a woman. Afterwards they went for a ride. "When they came across the victim, it was decided they would steal his car. When the victim resisted, a struggle ensued. He thought that the victim had some sort of weapon, therefore he pulled out a gun and shot the victim twice in the back. When the victim fell out of the vehicle, he shot the victim three more times as he lay on the ground. He then ran away."

A couple days later a telephone conversation between Estrada, Galvan, and defendant was monitored from the jail. Estrada told Galvan to wear her hair with bangs during the police lineup. Estrada also stated that he would not be doing life in prison.

On August 17, 2002, defendant and Galvan were arrested when they arrived at defendant's residence together. When questioned, Galvan stated that because she consumed methamphetamine prior to the homicide, her recollection of the events was not precise. She stated that Estrada and defendant were passengers in her vehicle. "After the shooting, she drove about two blocks and picked up Estrada and [defendant]. Afterwards, the trio went to Salinas and dropped off the car with [its] owner."

10

The probation report stated that defendant denied any knowledge of the homicide when questioned post-arrest.

The probation report detailed defendant's juvenile record and stated that defendant was convicted of felony assault with a deadly weapon (§ 245, subd. (a)(1)) on April 2, 2002.

**D.** ***The Superior Court's Ruling on the Section 1170.95 Petition After the Evidentiary Hearing***

The superior court denied the section 1170.95 petition, determining that "[d]efendant was a major participant in this crime and did act with reckless indifference to human life. He aided, abetted and assisted in the commission of the felonies of robbery and carjacking, or attempted robbery and attempted carjacking, which resulted in the death of the victim, Mr. Sanchez."

The court stated that it found Sanchez's girlfriend "a very credible witness" and that her testimony was "truthful and credible." The court then summarized the factors discussed by the California Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) that may be weighed in determining whether an individual was a major participant in the underlying felony and acted with reckless indifference to human life.[6]

Regarding whether defendant was a major participant in the underlying felony, the court first found that defendant's role in planning the criminal enterprise was "significant."

---

[6] In *Banks* and *Clark*, the California Supreme Court "clarified the meaning of the special circumstances statute." (*In re Scoggins* (2020) 9 Cal.5th 667, 671.) "The requirements of the felony-murder special circumstance mirror the [current] requirements of felony murder. [Citations.] That is, the felony-murder special circumstance applies where (1) the murder occurred during the commission of a specified felony and (2) the defendant was the actual killer; with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the murder; or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the felony. (§ 190.2, subds. (a)(17), (c), (d).)" (*People v. Pineda* (2021) 66 Cal.App.5th 792, 798, review granted Sept. 29, 2021, S270513.)

Second, the court determined that defendant did not supply the weapon used in the offense. Third, the court found that defendant was aware of the dangers posed by the nature of the crime, the weapons used, and the past conduct of the coparticipants. The court observed that defendant and Estrada were both Norteño members and that the Norteños are a violent gang that uses weapons and fear; a search found defendant in possession of "firearms [*sic*] and ammunition"; defendant had participated in "these types of crimes" previously; and defendant's "intimate relationship with Norte[ñ]o street gangs and the subset that he was involved in gave him more experience and information and knowledge of this type of crime and what could happen." Fourth, the court found that defendant was present at the scene of the killing, was involved in attacking Sanchez and continued to attack Sanchez after he had been shot, and was in a position to help Sanchez and stop the attack but did not. Fifth, the court found that after lethal force was used defendant continued to attack Sanchez and ran away as Sanchez lay dying in the street.

Regarding whether defendant acted with reckless indifference to human life, the court determined that defendant "ha[d] knowledge that his continued actions in the attack would result in [Sanchez] losing his life." The court first found that although defendant had knowledge of weapons and awareness of how to use them, it was unclear whether defendant knew a firearm would be used in the attack. But it was also apparent that defendant was not surprised or afraid after the first shot was fired. Second, the court found defendant was present at the crime and "active from the beginning to the end of the attack and murder. . . . [Defendant] had numerous opportunities to stop the attack, stop his own use of force, and intercede to aid the victim," but he did not. Third, the court found the duration of the crime was several minutes. Fourth, the court found that while there was no direct evidence that defendant knew of Estrada's prior attacks with firearms, there was evidence that defendant and Estrada had committed prior robberies together and that "their ties to the Norte[ñ]o gang and culture provide some evidence of the propensity of either or both of them to use lethal force as a method of improving their standing in the gang, improving the

12

standing of the gang itself through instilling fear, and becoming more important within the gang that is such an intimate part of their lives." Fifth, the court found that defendant did "nothing whatsoever" to minimize the risks of violence during the underlying felony, but instead "did everything to further enhance risks of violence and of death."

The court concluded that "[u]nder these circumstances, . . . [d]efendant was a major participant in this crime and did act with reckless indifference to human life."

### III. DISCUSSION

#### A. *Statutory Framework*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "amend[ed] the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant of the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The bill amended section 188 by adding subdivision (a)(3), which provides: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2; § 188, subd. (a)(3).) And section 189, subdivision (e) now limits liability for murder to a person who was either the actual killer or, though not the actual killer, acted "with intent to kill" and "aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer" in the commission of first degree murder, or was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 3; § 189, subd. (e).)

In addition to the amendments to sections 188 and 189, Senate Bill 1437 added section 1170.95. (Stats. 2018, ch. 1015, § 4.) As relevant here, section 1170.95 allows "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that

13

person's participation in a crime" to petition the sentencing court to vacate the murder conviction and be resentenced on any remaining counts. (§ 1170.95, subd. (a).) All of the following conditions must apply to warrant section 1170.95 relief: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine[,] or other theory under which malice is imputed to a person based solely on that person's participation in a crime"; "(2) The petitioner was convicted of murder . . . following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder"; and "(3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

If the court finds that the petitioner has made a prima facie showing for relief, it issues an order to show cause and holds a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) The burden of proof at the hearing is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).) Both parties may rely on the record of conviction or present new or additional evidence at the hearing. (*Ibid.*)

**B.      *Whether the Superior Court Applied the Correct Standard of Proof***

Defendant contends that reversal is required because it is unclear whether the superior court applied the correct standard of proof when it denied the petition after the evidentiary hearing. We are not persuaded.

**1.  The Superior Court's Statements Regarding the Standard of Proof**

During the evidentiary hearing and in its ruling, the superior court made several statements regarding the burden and standard of proof. At the start of the evidentiary hearing, the court stated that "[t]he burden of proof . . . pursuant to [section] 1170.95 in this

14

matter is on the prosecution, and that burden is to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing."

At the outset of its ruling, the court found that the first requirement for section 1170.95 relief "occurred when" an amended complaint was filed that allowed the prosecution to proceed on a theory of felony murder or murder under the natural and probable consequences doctrine. The court found that the second requirement "occurred . . . when" defendant pleaded guilty to first degree murder. The court stated that "the third requirement is that the [p]etitioner could not be convicted of first or second-degree murder because of the changes to Penal Code [s]ection 188 or 189 made effective January the 1st of 2019." Thus, "the remaining question for this [c]ourt to answer is upon review of the hearing and documents submitted with the changes to Penal Code [s]ection[s] 188 and . . . 189 result [*sic*] in no murder conviction if . . . [d]efendant was facing these charges today. [¶] The burden is on the People to prove beyond a reasonable doubt that . . . [d]efendant is ineligible for resentencing." Later in its ruling, the court stated that it was determining "whether or not . . . [d]efendant would be convicted of murder if he were facing these charges under the definition of murder that exists today in Penal Code [s]ection[s] 188 and 189."

Finally, at the conclusion of its ruling, the court summarized the evidence against defendant as it pertained to the *Banks* and *Clark* factors and stated, "Under these circumstances, the [c]ourt finds that . . . [d]efendant was a major participant in this crime and did act with reckless indifference to human life. He aided, abetted and assisted in the commission of the felonies of robbery and carjacking, or attempted robbery and attempted carjacking, which resulted in the death of the victim, Mr. Sanchez. [¶] So with that, I will respectfully deny the [section] 1170.95 [petition]."

### 2. The Statutory Language Regarding the Standard of Proof

When the evidentiary hearing was held in April 2021 and the superior court issued its ruling in May 2021, section 1170.95 stated: "At the hearing to determine whether the

petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3).) Based on that statutory language, several Courts of Appeal, including this court, held that to establish a petitioner's ineligibility for relief, the prosecution had to prove beyond a reasonable doubt each element of first or second degree murder under current law. However, at least one court held that the prosecution must prove beyond a reasonable doubt that a reasonable jury could find defendant guilty of murder under current law—which the court characterized as nearly identical to the substantial evidence standard. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 952-953 [noting the split], review granted Apr. 28, 2021, S267802.)[7]

The Legislature subsequently passed Senate Bill No. 775 (Senate Bill 775), which "[r]eaffirms that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt." (Stats. 2021, ch. 551, § 1, subd. (c).) As relevant here, effective January 1, 2022, Senate Bill 775 amended section 1170.95, subdivision (d)(3) to state: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Stats. 2021, ch. 551, § 2.)

### 3. Analysis

"On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is

---

[7] We do not cite these cases directly because the California Supreme Court has ordered them depublished.

silent, and error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666 (*Giordano*).)

Here, several of the superior court's statements closely mirrored the statutory language that applied at the time of the hearing regarding the burden and standard of proof once an order to show cause has issued—namely, "the burden [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3).) For example, the court stated at the beginning of the evidentiary hearing that "[t]he burden of proof . . . pursuant to [section] 1170.95 in this matter is on the prosecution, and that burden is to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing." And it stated at the outset of its ruling that "[t]he burden is on the People to prove beyond a reasonable doubt that the [d]efendant is ineligible for resentencing." The court's statements also reflected the third requirement of eligibility for resentencing relief—namely, that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (Former § 1170.95, subd. (a)(3).)[8] For example, the court stated during its ruling that it was determining "whether or not . . . [d]efendant would be convicted of murder if he were facing these charges under the definition of murder that exists today in Penal Code [s]ection[s] 188 and 189."

Although the superior court's statements were at times ambiguous, with the court stating at one point that "the remaining question for this [c]ourt to answer is upon review of the hearing and documents submitted with the changes to Penal Code [s]ection[s] 188 and . . . 189 result [*sic*] in no murder conviction if . . . [d]efendant was facing these charges today," the court clearly understood that the burden was on the prosecution and that the standard of proof was beyond a reasonable doubt. That the court was aware that the

---

[8] Section 1170.95, subdivision (a)(3) currently provides, "The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."

17

prosecution had to currently prove to the court, rather than to demonstrate that it was able to prove to some hypothetical factfinder, that defendant was a major participant and acted with reckless indifference to human life is apparent from the court's statement, "Under these circumstances, the [c]ourt finds that . . . [d]efendant was a major participant in this crime and did act with reckless indifference to human life." Thus, taken together, the court's comments establish that the court applied the correct standard—that the prosecution had to prove beyond a reasonable doubt that defendant is guilty of murder under section 188 or 189, effective January 1, 2019. (§ 1170.95, subd. (d)(3).) At no point did the court state that it was applying the substantial evidence standard or that substantial evidence would support a finding that defendant was a major participant and acted with reckless indifference to human life.

On this record, defendant has failed to " ' "affirmatively show[]" ' " that the superior court applied the incorrect standard of proof when it denied the section 1170.95 petition. (*Giordano*, *supra*, 42 Cal.4th at p. 666.)

### C.     *Whether Substantial Evidence Supports the Superior Court's Ruling*

Defendant contends that his due process rights were violated because there is insufficient evidence to sustain the superior court's determination that he was a major participant in the underlying felony and acted with reckless indifference to human life. We conclude that substantial evidence supports the superior court's decision.

#### 1.   *Banks* **and** *Clark*

As we stated above, in *Banks* and *Clark* the California Supreme Court clarified the meaning of the felony-murder special circumstance statute and discussed factors that may be weighed in determining whether an individual was a major participant in the underlying felony and acted with reckless indifference to human life.

In *Banks*, the court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks*, *supra*, 61 Cal.4th at p. 794.) The court held that "a defendant's personal involvement must be substantial, greater than

18

the actions of an ordinary aider and abettor to an ordinary felony murder." (*Id.* at p. 802.) Factors identified by the court that may be weighed in that determination are: (1) "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?"; (2) "What role did the defendant have in supplying or using lethal weapons?"; (3) "What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?"; (4) "Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?"; and (5) "What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

In *Clark*, the California Supreme Court held that reckless indifference to human life has "both subjective and objective elements." (*Clark*, *supra*, 63 Cal.4th at p. 617.) "The subjective element is the defendant's conscious disregard of [the grave] risks [of death] known to him or her." (*Ibid.*) As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*) Factors identified by the court that may be weighed in that determination are: (1) the defendant's knowledge of weapons, the number of weapons, and whether the defendant used a weapon; (2) the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the underlying felony; (4) the defendant's knowledge of his or her cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of violence during the underlying felony. (*Id.* at pp. 618-622.) "Just as [the court] said of the factors concerning major participant status in *Banks*, '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618.)

19

## 2. Standard of Review

We review a superior court's factfinding, including a determination after a section 1170.95 evidentiary hearing that the defendant was a major participant and acted with reckless indifference to human life, for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) Thus, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

## 3. Analysis

### a. *Major Participant in the Underlying Felony*

Regarding whether there is substantial evidence that defendant was a major participant in the underlying felony, the evidence shows that defendant and Estrada decided to steal Sanchez's car. They then alighted from their vehicle, approached Sanchez in the driver's seat, demanded his wallet and keys, and ordered him from his car. When Sanchez resisted their demands, defendant and Estrada worked together to try to force him from the vehicle. Defendant punched Sanchez repeatedly to try to get him out of the car, and continued to do so after Estrada shot at Sanchez from the passenger side of the vehicle. Defendant persisted in his attack on Sanchez while Estrada ran back to the driver's side and shot Sanchez at least twice more. Defendant and Estrada then fled as Sanchez lay dying in the street. This evidence supports a finding that "defendant's personal involvement [was]

20

substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

Indeed, there is strong evidence of several of the *Banks* factors here. The evidence shows that defendant had an active "role . . . in planning the criminal enterprise that led to [Sanchez's] death[]." (*Banks*, *supra*, 61 Cal.4th at p. 803 [first *Banks* factor].) Not only did Estrada tell law enforcement that he and defendant decided to steal the car "[w]hen they came across the victim," it is reasonable to infer from their coordinated actions that defendant and Estrada planned to rob Sanchez and carjack his vehicle. In addition, defendant was "present at the scene of the killing" and fled "after lethal force was used." (*Ibid.* [fourth and fifth *Banks* factors].) And it is reasonable to infer from the evidence that defendant "facilitate[d] . . . the actual murder," as he continued hitting and punching Sanchez after Estrada first shot at him, allowing Estrada to run back to the driver's side and shoot at Sanchez two to three more times. (*Ibid.* [fourth *Banks* factor].)

In arguing that the evidence is insufficient, defendant asserts that "no evidence was presented that [he] knew he was participating in an *armed* robbery," and that even if he were aware, "this alone [is] insufficient to show that [he] was a major participant." (Italics added.) Defendant analogizes this case to *In re Ramirez* (2019) 32 Cal.App.5th 384 (*Ramirez*). There, the defendant knew that he was participating in an armed robbery when he and three others, Candido, Josh, and Eustacio, rode a couple of bicycles across the street from a bar. (*Id.* at pp. 389-390.) Candido selected a truck in the bar's parking lot to rob and gave the defendant his bicycle to hold. (*Id.* at p. 390.) Candido and Josh then approached the truck while the defendant and Eustacio waited behind. (*Ibid.*) Approximately eight shots rang out. (*Ibid.*) Eustacio moved toward the truck with the defendant following him. (*Ibid.*) Candido told Eustacio and the defendant that "they were to 'get out of here,' " and the group fled. (*Ibid.*) The driver of the truck died from gunshot wounds to his head, chest, right hip, upper right arm, and left finger. (*Id.* at pp. 390-391.)

21

The Court of Appeal held that there was insufficient evidence to support the jury's felony-murder special circumstance finding, in part because the defendant's personal involvement in the underlying offense was not substantial. (*Ramirez*, *supra*, 32 Cal.App.5th at p. 405.) The court found the defendant's conduct akin to that of a getaway driver, as there was no evidence that a killing was planned or contemplated and the defendant was not in such close proximity to the offense that he could have restrained his coparticipants. (*Id.* at pp. 404-405.)

Here, in contrast, defendant did not simply participate in an attempted robbery and carjacking from afar. Unlike the defendant in *Ramirez*, defendant personally attacked the victim and continued his attack even after his coparticipant Estrada fired the first shot. Also unlike the defendant in *Ramirez*, defendant was in close enough proximity that he could have restrained Estrada. Instead, defendant facilitated Estrada's violence. And while defendant argues that there is no evidence that he knew he was participating in an armed robbery, it is reasonable to infer that at the least, defendant became aware that he was participating in an armed robbery once Estrada shot at Sanchez from the passenger side of the vehicle. At that point, knowing that Estrada was armed, defendant continued his efforts in trying to forcibly remove Sanchez from the car; defendant did not desist.

In sum, the evidence sufficiently supports the superior court's determination that defendant was a major participant in the underlying attempted robbery and carjacking.

### b. *Reckless Indifference to Human Life*

Turning to the sufficiency of the evidence that defendant acted with reckless indifference to human life, there is substantial evidence in the record to support a finding of the "subjective and objective elements" of that mens rea. (*Clark*, *supra*, 63 Cal.4th at p. 617.) It is reasonable to infer that defendant "conscious[ly] disregard[ed]" the grave risks of death known to him based on the evidence that he continued his attack on Sanchez, who was in the driver's seat, even after Estrada shot at Sanchez from inside the front passenger area of the car and then came around to the driver's side. (*Ibid.* [subjective element].) This

22

evidence also supports a finding that " '[t]he risk [of death] [was] of such a nature and degree that, considering the nature and purpose of [defendant's] conduct and the circumstances known to him, its disregard involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in [defendant's] situation.' " (*Ibid.* [objective element].)

Regarding the first *Clark* factor, defendant's knowledge of weapons, it is reasonable to infer that once Estrada fired the first shot at Sanchez from the passenger side, defendant knew Estrada was armed with a weapon and there was " 'a reasonable expectation that the death of the deceased or another would result.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Despite that, defendant continued his participation in the attempted robbery and carjacking by persisting in his attack on Sanchez even when Estrada came back to the driver's side, with both men "hitting . . . Sanchez [and] trying to do whatever they could to get him out of the car," before Estrada shot at Sanchez two to three more times.

As to the second factor, defendant was physically present at the crime and had opportunities to restrain Estrada and aid Sanchez, but he did not. (See *Clark*, *supra*, 63 Cal.4th at p. 619.) Defendant acted together with Estrada in approaching Sanchez's vehicle and forcibly trying to remove Sanchez from his car. Defendant then continued to hit Sanchez after Estrada fired the first shot from the passenger side of Sanchez's vehicle and ran back around to the driver's side, where both men swung at Sanchez before Estrada fired two to three more shots. Defendant fled as Sanchez lay dying. This evidence of defendant's presence and conduct render it "fair to conclude that he shared in [his cohort's] actions and mental state." (*Ibid.*)

While the third *Clark* factor, duration of the underlying felony, does not support a finding of reckless indifference as the attempted robbery and carjacking seemingly lasted a short time, there is some evidence of the fourth factor, namely, defendant's knowledge of Estrada's likelihood of killing. (See *Clark*, *supra*, 63 Cal.4th at pp. 620-621.) Defendant and Estrada were close friends and Norteños members, and it does not appear that defendant

23

was in any way surprised by Estrada's use of lethal force. Rather than stopping his attack against Sanchez or making any statements when Estrada fired the first shot at close range, defendant simply continued hitting Sanchez and trying to remove him from the car as Estrada ran around to the driver's side, joined defendant in swinging at Sanchez, and then fired two to three more shots. Finally, regarding the fifth *Clark* factor, there is no evidence that defendant "made some effort to minimize the risk of violence." (See *Clark*, *supra*, 63 Cal.4th at p. 622.)

Defendant challenges the credibility of Sanchez's girlfriend's testimony at the evidentiary hearing, but in our substantial evidence review, we do not " 'reevaluate[] a witness's credibility.' [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 60.) And we observe that in addition to the girlfriend's testimony, Sergeant Uretsky testified that police found shell casings on both sides of Sanchez's vehicle, which corroborates the girlfriend's testimony that Estrada shot at Sanchez from both the passenger and driver's side.

In sum, we find sufficient evidence to support the superior court's determination that defendant acted with reckless indifference to human life, as the record shows defendant's "willingness . . . to assist another in killing[] to achieve a distinct aim, even if [he] d[id] not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)

For these reasons, we conclude that the record contains "evidence that is reasonable, credible, and of solid value" from which the superior court could find beyond a reasonable doubt that defendant was a major participant in the underlying attempted robbery and carjacking and acted with reckless indifference to human life. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) We therefore reject defendant's insufficient evidence claim.

## IV.    DISPOSITION

The superior court's order denying defendant's Penal Code section 1170.95 petition is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*People v. Quintos*
**H049174**